Reginald TRAMMELL, Plaintiff–Appellant,

v.

John KEANE, Superintendent, Phil Coombe, Correction Commissioner, Donald Selsky, Deputy Commissioner, B. Kehn, Deputy Superintendent, D. Davis, Deputy Superintendent, C. Griener, Deputy Superintendent, Garrillo, Deputy Superintendent, D. Starks, Captain, R. Ercole, Captain, R. Healy, Captain, T. Fitzgerald, Lieutenant, P. Gibson, Captain, A. Diazays, Captain, A. Enceneat, Captain, J. Wohirab, Captain, Sarreh, Captain, Bunato, Captain, Patterson, Captain, McGovern, Captain, Magwood, Captain, Christian, Captain, F. Sysco, Sergeant, R. Pauley, Sergeant, J. Pickett, Sergeant, J. Temple, Hearing Officer, J. Mahoney, Hearing Officer, D. Manwaring, Hearing Officer, Rodriguez, Hearing Officer, T. Burns, Correction Officer, A. Diai, Correction Officer, B. Fields, Correction Officer, T. Ackerson, Hearing Officer, Dr. Kapoore, Williams, Physician Asst., Nurse Phert, Nurse Prigitano, M. White, U.S. Attorney, D. Vacco, Attorney General, B. Malone, Inspector General, C. Vergar, District Attorney, Defendants–Appellees.

Docket No. 01–0025.

United States Court of Appeals, Second Circuit.

Argued April 7, 2003.

Decided Aug. 1, 2003.

Alessandra Testa (Lauren Reiter Brody and Frances K. Browne, of counsel), Kat-

ten, Muchin, Zavis & Rosenman, New York, NY, for Plaintiff–Appellant.

Marion Buchbinder, Assistant Solicitor General (Eliot Spitzer, Attorney General of the State of New York, Carol Fischer, Assistant Solicitor General, of counsel), New York, NY, for Defendants–Appellees.

Before: WALKER, Chief Judge, OAKES and WINTER, Circuit Judges.

JOHN M. WALKER, JR., Chief Judge.

Plaintiff-appellant Reginald Trammell, a New York State prisoner, appeals from a judgment of the United States District Court for the Southern District of New York (Loretta Preska, *District Judge* ), granting defendants' motion for summary judgment and dismissing Trammell's complaint brought pursuant to 42 U.S.C. § 1983. In his complaint, Trammell claims various violations of his right to due process and his Eighth Amendment right to be free from "cruel and unusual punishment." As we explain below, the only claim at issue in this appeal is Trammell's contention that a deprivation order issued by a prison official on December 16, 1994 ("the Order" or "the December 16 Order"), and follow-up orders issued over the subsequent weeks, violated the Eighth Amendment. For the reasons that follow, we affirm the district court's order granting defendants' motion for summary judgment.

## I. *BACKGROUND*

### A. *Prison Disciplinary Actions*

During the relevant period of time, Trammell was at New York's Sing Sing Correctional Facility ("Sing Sing"), serving an indeterminate sentence of five to ten years for robbery in the second degree. *People v. Trammell,* 211 A.D.2d 527, 622 N.Y.S.2d 439 (1995), *appeal denied,* 85 N.Y.2d 944, 627 N.Y.S.2d 1006, 651 N.E.2d 931 (1995). By the time of the challenged incidents, Trammell had already earned a lengthy prison disciplinary record and had been indicted for assault on two occasions, including a "serious assault of a corrections officer." As a consequence, Trammell was serving his sentence in the Special Housing Unit ("SHU") when the events at issue in this case transpired.

Starting in November 1994, Trammell became more and more uncontrollable. In the five weeks from November 11, 1994 to December 16, 1994, Trammell was cited for no fewer than sixteen disciplinary violations. One of Trammell's preferred forms of misbehavior was to throw various substances—such as drinks, soup, spit, urine, and feces—at correctional officers or others near his cell. Trammell does not dispute any of these facts.

In response to all of this misconduct, the corrections officers in the SHU imposed increasingly severe disciplinary measures. These generally took the form of prolonging his time in the SHU, taking away "good time" (effectively increasing his period of imprisonment) or issuing "deprivation orders" that curtailed privileges and amenities. As an example of the latter, for spitting on an officer on November 22, 1994, a hearing officer ordered that Trammell lose phone, commissary, and package privileges for thirty days. Again, after officers discovered contraband in Trammell's cell on December 5, 1994, and cited him for "interference with [an] employee" and refusing to obey a direct order, Trammell lost phone, commissary, and package privileges for six months, as well as six months "good time." Despite these disciplinary measures and deprivation orders, Trammell's violent and unruly behavior continued.

Matters came to a head on December 16, 1994. Trammell spit or threw a liquid

at Correctional Officer Fernandez, a notary, who had gone to Trammell's cell to notarize legal papers for him. Later that day, Deputy Superintendent Kehn issued the first of several deprivation orders that are the primary subject of this appeal. The December 16 Order, issued pursuant to 7 N.Y.C.R.R. § 305.2, deprived Trammell of "all state and personal property in [his] cell except one pair of shorts. No recreation, No shower, No hot water, No cell bucket because it is determined that a threat to the safety or security of staff, inmates, or state property exists." Pursuant to the Order, the corrections officers removed all of Trammell's clothing (except for one pair of undershorts), all of his toiletries (*e.g.*, soap, toothpaste, toothbrush), his mattress, blanket, and cell bucket. Although the record is unclear, Trammell's toilet paper was either removed, or he was left with an inadequate supply; in any event, he says he went about a week without toilet paper. The December 16 Order also extended the duration of a restricted diet of "nutriloaf" (a bread-like food containing carrots and potatoes) and raw cabbage for approximately 95 days. Trammell also alleges that a prior deprivation order was extended so that he was denied out-of-cell exercise from December 16, 1994 to January 6, 1995.

Pursuant to Section 305.2, all deprivation orders must be reviewed daily by the deputy superintendent and, if lasting more than seven days, must be reissued in writing every seven days. *See* 7 N.Y.C.R.R. § 305.2(c). The memorandum accompanying the December 16 Order stated that the terms of the deprivation would be "reviewed daily," and told Trammell that his "property [would be] restored as your adjustment improves. Initially you will receive a blanket and mattress after a period of 48 hours without a Misbehavior Report." [1]

On December 17, 1994, Kehn and Captain Healy found that Trammell was wearing clothing that had apparently been lent to him by a fellow inmate. Kehn ordered the officers to remove Trammell's clothing from him, and authorized them to subdue Trammell with tear gas in order to remove his clothing if he refused to voluntarily turn over the clothing. When Trammell refused to cooperate, the officers—defendants Kehn, Starks, Ercole, Healy, Bunato, Gibson, Fitzgerald, and Pickett—

1. The memorandum explained the terms of the Order and its contingency on his improved behavior:

> Due to your continuous violent conduct, assaults on staff, unhygienic acts and direct order violations, your confinement status in the Special Housing Unit will be as follows:
> *Deprivation of all State and Personal Property*—the status of this order will be reviewed daily with your property restored as your adjustment improves. Initially you will receive a blanket and mattress after a period of 48 hours without a Misbehavior Report.
> *Restraint Order*—all such orders will be reviewed daily and change will depend on your positive adjustment. This also includes out of cell exercise.
> *Restricted Diets*—will remain in effect until all disciplinary sanctions are fulfilled under the terms and conditions of Codes, Rules and Regulations of Title 7, Chapter V. Any modification of these sanctions will be determined by your positive adjustment.
> *Cell Shield*—same as above.
> All of these restrictions that require a review will involve the facility officer-of-the-day and/or Deputy Supt. for Security Greiner and myself. Your continued disruptive and assaultive behavior will result in continuation of these restrictions in line with all applicable laws, directives and policies. If you are expecting a transfer, I have spoken to Mr. D. Selsky, Director of Special Housing, and no such transfer will be submitted by this facility. The speed at which your privileges will be restored depends totally on your behavior.

sprayed tear gas into Trammell's cell, ordered him to lie down, restrained him using hand-cuffs and leg restraints, and carried him outdoors where they cut the clothing from his body. They then took him in his underwear to a shower where they washed him off before returning him to his cell.

Although there are minor disagreements regarding how long Trammell was deprived of various items, there is very little daylight between the assertions of the parties. Trammell maintains in his complaint that he was continuously deprived of clothing for three to four weeks, and was deprived of his mattress and blanket for slightly less time. Defendants' contentions are more detailed, but they largely corroborate Trammell's allegations and his testimony given in a state court hearing. On December 20, the officials returned Trammell's mattress and blanket. On December 22, they returned his clothing, but on December 23, Superintendent Keane issued a new deprivation order, directing that all of Trammell's property (including, presumably, his mattress and blanket) be removed. Defendants concede that "no separate misbehavior report documents" why this second order was issued and it remains unclear whether the order was put into effect. However, because for purposes of this appeal all evidentiary ambiguities must be resolved in Trammell's favor, we will assume that all of Trammell's property was removed again on December 23, 1994. In any event, there is no dispute that, on December 27, 1994, the full deprivation order was put back into effect after Trammell again threw liquid at a corrections officer.

Prison records reflect that, after December 27, Trammell's property was returned in stages: the mattress and blanket on December 30, limited clothing and toiletries on January 4, 1995, and shoes and sweatshirt on January 7. By January 13, all property had been returned and the deprivation order lifted, except for the restricted diet. To recap, according to prison records, Trammell was deprived of a mattress and bedding for fourteen days, clothing and toiletries for seventeen days, and—although the record is not clear on this point—was left with an inadequate supply of toilet paper for approximately a week.

Trammell contends that during this period he was given inadequate access to medical care which compounded the ill effects of the deprivations. Trammell alleges that "of the few complaints that were forwarded to the medical department, defendants Kapoor, Williams, Phelt and Prigitano responded by stating that per security[,] I could not be removed from such cell for examination." Trammell also claims to have requested psychiatric treatment, but was told that his requests were denied because he was being punished. Defendants agree that Trammell made these medical complaints and requests, but counter that a nurse makes rounds on the SHU every day "and responds to any health-related complaint an SHU inmate may have. If the nurse had informed an appropriate official that plaintiff was not in good health, the deprivation order would not have been continued after each daily review." Between December 16, 1994 and January 13, 1995, SHU nurses observed Trammell in his cell on twelve occasions. The nurses' notes reveal that, on occasion, Trammell complained of coldness, chest pains, sinus problems, sore throat, and bleeding from his rectum (a condition that was apparently related to an on-going medical condition for which he received treatment). In response to these complaints, Trammell was given basic medication, such as Sudafed.

## B. The New York State Article 78 Proceeding

Trammell, acting *pro se*, brought an Article 78 proceeding in New York State court in February of 1995, asserting that the defendant corrections officers violated state law and federal constitutional law. Specifically, he claimed that defendants (1) violated state law and federal due process by denying him access to psychiatric treatment; (2) violated state law and federal due process by conducting over twenty-five disciplinary hearings in his absence; (3) violated his right to be free from cruel and unusual punishment by subjecting him to tear gas for non-compliance with the deprivation order; and (4) showed deliberate indifference to a medical condition by subjecting to him to the restricted diet while he complained of abdominal pain and "a case of internal bleeding."

The New York Supreme Court assigned counsel for Trammell, removed the restricted diet order, and held hearings concerning the deprivation orders. In an order dated September 6, 1996, the state court dismissed most of Trammell's claims, but found that the December 16 Order "had gone too far" by depriving Trammell of all property, including basic necessities such as clothing, blankets, mattress, toiletries, and toilet paper. The state court determined that 7 N.Y.C.R.R. § 302.2(f) authorizes denial of specific property "[i]f *possession* of any item . . . is determined to present a threat to the safety or security" of others at the prison, but not as punishment. *Trammell v. Coombe*, 649 N.Y.S.2d 964, 1996 WL 636012, slip op. at 8 (Sept. 6, 1996) (emphasis in original). The state court did not consider the issue before us, namely, whether the Order also violated the Eighth Amendment's ban on cruel and unusual punishment.

## C. Trammell's Section 1983 Action

In January 1996 (before the state court issued its ruling), Trammell again acting *pro se*, brought the instant Section 1983 action in federal court. Trammell claimed that the prison officials' conduct gave rise to four different constitutional violations: (1) the imposition and enforcement of the December 16 Order constituted cruel and unusual punishment; (2) enforcement of the deprivation order in the face of his failing physical health, and denial of psychiatric treatment, constituted deliberate indifference to his medical needs; (3) holding twenty-five disciplinary hearings in his absence violated due process; (4) various prosecutors' failure to investigate his allegations of mistreatment at the hands of the prison officials was an independent civil rights violation.

The state defendants (various Sing Sing personnel) moved to dismiss Trammell's complaint and the defendant prosecutors moved to dismiss the fourth claim (the only claim that pertained to them). In an order dated October 16, 1996, Judge Preska dismissed the fourth claim, converted the motion to dismiss the third claim to a motion for summary judgment, invited submission of supporting affidavits and other materials, and directed the parties to address certain legal questions she thought particularly relevant. Defendants filed papers in support of summary judgment on all three remaining claims, urging, *inter alia*, that Trammell's claims were barred by collateral estoppel. On August 21, 1997, the district court granted that motion in its entirety. On December 23, 1999, we vacated that order on the grounds that Trammell had not been given notice that the court was converting defendants' motion to dismiss into a motion for summary judgment of the entire complaint, that he needed to present evidence in opposition to the motion for summary

judgment, and that the likely consequence of failing to respond was dismissal of the complaint. *See Trammell v. Coombe*, 1999 WL 1295856, at *2 (2d Cir. Dec.23, 1999). On remand, after receiving a renewed motion from the defendants and submissions from Trammell, the district court granted the defendants' motion for summary judgment in its entirety on the grounds stated in the August 1997 order. *See Trammell v. Coombe*, 2000 WL 1793391 (S.D.N.Y. Dec.5, 2000).

We affirmed the district court's dismissal of the second, third, and fourth claims in an order dated June 20, 2001. In the same order, we appointed counsel and directed the parties to brief the remaining claim, "whether the district court's grant of summary judgment on appellant's Eighth Amendment claim concerning [the December 16, 1994] deprivation order issued by appellees was erroneous," to which we now turn.

## II. *DISCUSSION*

■ The Eighth Amendment prohibits the infliction of "cruel and unusual punishment," U.S. Const. amend. VIII, and applies to states through the Due Process Clause of the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 666–67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). To prove a violation of the Eighth Amendment, an inmate must show (1) that the deprivation alleged is "objectively sufficiently serious" such that the plaintiff

was denied "the minimal civilized measure of life's necessities," and (2) that the defendant official possessed a "sufficiently culpable state of mind" associated with "the unnecessary and wanton infliction of pain." *See Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoted in *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir.2001)).

■ This court reviews a grant of summary judgment *de novo. See Sheppard v. Beerman*, 317 F.3d 351, 354 (2d Cir.2003). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Even where facts are disputed, in order to defeat summary judgment, the non-moving party must offer enough evidence to enable a reasonable jury to return a verdict in that party's favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When ruling on a motion for summary judgment, a court is required to construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor. *See id.* at 255, 106 S.Ct. 2505; *Maguire v. Citicorp Retail Servs., Inc.*, 147 F.3d 232, 235 (2d Cir.1998).[2]

As an initial matter, it is important to identify exactly what conduct is at issue in this case. Trammell does not challenge the constitutionality of the use of tear gas

---

**2.** On appeal, Trammell argues that the district court's grant of defendants' motion to dismiss without first allowing any discovery is itself grounds for vacatur. As a general matter, we agree that "[o]nly in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir.2000). In this case, however, Trammell was afforded discovery, including deposition of the key defendants, in the state court action. Although it may have been preferable in this case to allow limited discovery on the claim that was not barred by *res judicata*, given the well-developed record, we do not think that denial of discovery merits vacatur. *See M.B. # 11072–054 v. Reish*, 119 F.3d 230, 232 (2d Cir.1997) (where prisoner's Section 1983 claims are insufficient as a matter of law and the record before the district court sufficient, denial of discovery is not a basis for vacatur).

on December 17, 1994, nor the constitutionality of the deprivation orders imposed prior to December 16, 1994. He attacks only the December 16 Order and the orders immediately following. The state court rejected Trammell's due process claims and his claim that he was deprived of adequate medical attention while subjected to the terms of the Deprivation Order. Thus these claims, to the extent that they are raised here, are barred by *res judicata*. Finally, as we have stated, the state court found that the December 16 Order was improper because it was issued for reasons contrary to state law. To remedy this infraction, the state court expunged the Order from Trammell's prison records. We have no occasion to consider the propriety or impropriety of that ruling, as the legality of the December 16 Order under New York State law does not bear on whether the Order was unconstitutional under the Eighth Amendment. Accordingly, only one issue remains for determination: Whether the district court erred by granting defendants' motion for summary judgment on Trammell's claim that the imposition and enforcement of the December 16 Order violated the Eighth Amendment.

Trammell argues that he has satisfied both prongs of the *Farmer* analysis: (1) that the imposition and enforcement of the December 16 Order was "sufficiently serious" in objective terms, and (2) that the various defendants possessed the requisite mental state. *See Farmer*, 511 U.S. at 834, 114 S.Ct. 1970. We find that, viewed in the light most favorable to Trammell, there is no genuine dispute regarding any facts material to the prison officials' mental state in imposing and enforcing the December 16 Order, and that therefore Trammell has failed to satisfy *Farmer's* second prong. For that reason, we conclude with the district court that it is unnecessary to consider whether the condi-

tions of confinement to which Trammell was subjected were sufficiently serious to satisfy the first prong of the *Farmer* analysis.

 "After incarceration, only the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Ingraham v. Wright*, 430 U.S. 651, 670, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) (quotation marks and citations omitted). In cases involving prison uprisings or use of excessive force, a defendant must show that force was used "maliciously and sadistically for the very purpose of causing harm" in order to demonstrate the requisite scienter. *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973)). By contrast, "[i]n prison-conditions cases [the] state of mind [requirement] is one of 'deliberate indifference' to inmate health or safety." *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970 (internal quotation marks and citations omitted) (inadequate protection from prisoner-on-prisoner violence); *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (deliberate indifference standard applies to allegations of inadequate attention to prisoners' serious medical needs).

 In *Farmer*, the Court made clear that the use of the "malicious or sadistic" standard was appropriate in excessive force cases in part because the decision to use force is generally "made in haste, under pressure, and frequently without the luxury of a second chance." *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970 (quotation marks and citations omitted). We believe that standard to be inappropriate in the instant case where the disciplinary measures taken were preplanned and monitored. Hence, the deliberate indifference

standard is the proper measure of the prison official's scienter in this case. *See Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir.2001) (applying deliberate indifference standard in case involving allegations that inmate was exposed to unsanitary conditions and prolonged cold); *Blissett v. Coughlin*, 66 F.3d 531, 536–37 (2d Cir. 1995) (applying deliberate indifference standard in case involving allegations by inmate that he was kept for several days in a dark unsanitary observation cell, without any personal amenities).

■ Nevertheless, unlike some cases in which the deliberate indifference standard is appropriate, such as claims of inadequate medical care where the alleged Eighth Amendment violations do not implicate "competing institutional concerns," the disciplinary measures at issue in this case plainly implicate prison safety and discipline. *Cf. Whitley*, 475 U.S. at 320, 106 S.Ct. 1078 (the deliberate indifference standard is appropriate in medical care cases "because the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities" and hence does not implicate "competing institutional concerns for the safety of prison staff or other inmates"). Accordingly, the deliberate indifference standard must be applied in a way that accounts for the precise circumstances of the alleged misconduct and the competing institutional concerns. In so concluding, we take guidance from *Hope v. Pelzer*, in which the Court considered the constitutionality of the punishment of fastening a prisoner to a "hitching post." *See* 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). The Court analyzed that punitive measure as a condition of confinement and used the deliberate indifference standard, but the Court also took into account—as one would do in an excessive force case—whether the punishment was justified by "any safety concern" in the prison. *Id.* at 738, 122 S.Ct. 2508.

Accordingly, although we apply the lower—and from the plaintiff's perspective, more easily met—deliberate indifference scienter requirement, this case occasions no exception to the rule that "[p]rison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Consequently, we ask not simply whether the December 16 Order was imposed with "deliberate indifference" to Trammell's health and safety, for it is indisputable that the Order was intended to make Trammell uncomfortable in an effort to alter his behavior. Rather, we consider whether the Order was reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to Trammell's health and safety.

First, we find that the December 16 Order, while indeed onerous, even harsh, was reasonably calculated to correct Trammell's outrageous behavior. As described above, up to December 16th, Trammell was engaged in a campaign of repeated and escalating acts of misconduct that posed a significant threat to "internal order[,] discipline [, and] institutional security." *Id.* at 547, 99 S.Ct. 1861. Such acts surely warranted a strong disciplinary response from the prison administration, and the December 16 Order was a stern measure taken in response to Trammell's outrageous behavior. We find it especially significant that the December 16 Order was specifically drafted to punish Trammell for his misconduct, and to deter him

from similar acts in the future, while at the same time providing him with incentives to reform his behavior. The memorandum accompanying the Order reiterated several times that the duration of the deprivations and restrictions would be "determined by [his] positive adjustment" and that the "speed at which [his] privileges will be restored depends totally on [his] behavior." The memorandum explicitly informed him that his mattress and blanket would be returned "after a period of 48 hours without a Misbehavior Report." Thus, much as in the case of a coercive civil contempt order, where the contemnor can relieve himself of its burdens by committing an affirmative act, Trammell held the keys to his own cell door, figuratively speaking, and could have rid himself of the harshest aspects of the Order by simply reforming his behavior. *Cf. Int'l Union, UMW v. Bagwell*, 512 U.S. 821, 828, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1993).

Second, we find that defendants did not impose or enforce the December 16 Order with "deliberate indifference" to Trammell's "health or safety." Under this standard, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must ... be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, ... draw the inference," *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970, and "fail[ ] to take reasonable measures to abate it," *id.* at 847, 114 S.Ct. 1970. This did not happen here. A nurse regularly observed Trammell to ensure that his health was not jeopardized during the deprivation period. On most days, Trammell voiced no complaints about his health. On December 19, 1994, a SHU nurse visited Trammell's cell three times. Although Trammell claims that certain prison guards did not respond to some of his complaints, Trammell had regular contact with health professionals and many opportunities to inform them of his medical problems. Although Trammell's requests to be taken from his cell for medical evaluation were not granted, the record shows that the defendants were mindful of, not indifferent to, his health and ensured that his basic "health or safety" was not at risk.

Trammell further contends that he was kept virtually naked for a "prolonged period in bitter cold," a condition that we have found elsewhere would jeopardize an inmate's health or safety. *See Gaston*, 249 F.3d at 165 (reversing grant of summary judgment and noting that prolonged exposure to cold can constitute an Eighth Amendment violation); *Corselli v. Coughlin*, 842 F.2d 23, 27 (2d Cir.1988) (reversing grant of summary judgment where, *inter alia*, prisoner alleged that he had been deliberately exposed to bitter cold in his cell for three months); *Wright v. McMann*, 387 F.2d 519 (2d Cir.1967) (allegations that prisoner was denuded and exposed to bitter cold in solitary confinement cell for eleven days, that he was deprived of basic elements of hygiene such as soap and toilet paper, and that cell was filthy, without adequate heat, and virtually barren would, if established, constitute cruel and unusual punishment in violation of the Eighth Amendment). However, Trammell nowhere alleges that he was required to endure conditions or temperatures of the sort that we evaluated in *Corselli, Gaston*, or *Wright*. In *Corselli*, the prisoner was housed in a cell block with broken windows and the guards had intentionally removed the plastic sheeting that had been installed as an interim measure. *See* 842 F.2d at 27. The prisoner suffered through months of exposure to freezing temperatures and, as evidence that the temperatures in his cell were subfreezing, noted that the water in his toilet often froze. *See id.* The inmate in *Gaston* similarly complained that the windows

in his cell block were broken and "despite numerous complaints, [they] remained unrepaired for the entire winter, exposing inmates to freezing and sub-zero temperatures." 249 F.3d at 165. Finally, in *Wright*, the prison guards took the inmate's clothing and, during mid-winter, opened the windows in his cell block, exposing him to sub-freezing temperatures. *See* 387 F.2d at 521.

Thus, in *Corselli*, *Gaston*, and *Wright*, the prisoners alleged that they were directly exposed for lengthy periods to winter weather. There is no such claim here. Trammell's complaint and his statement submitted in satisfaction of Local Rule 56.1 are devoid of any allegations that the cell in which he was housed was open to the elements, that it lacked adequate heat, or, as he contends for the first time on appeal, that the cell was "bitter cold." His case is thus distinguishable from *Corselli*, *Gaston*, and *Wright*. We have no doubt that Trammell was made uncomfortable by the deprivation of his clothing, but there is simply no factual dispute regarding whether the temperature in his cell posed a threat to his "health or safety" of the sort that would disallow summary judgment in defendants' favor.

█ We also reject the proposition that defendants deprived Trammell of his toiletries with deliberate indifference to his health or safety. Although this court and other circuits have recognized that deprivation of toiletries, and especially toilet paper, can rise to the level of unconstitutional conditions of confinement, *see Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir.1996) (allowing inmate only minimum amounts of toilet paper can contribute to unconstitutional conditions of confinement); *Young v. Quinlan*, 960 F.2d 351, 365 (3d Cir.1992) (detention of inmate in cell without running water for four days without toilet paper, and without urinal for

first twenty-nine hours raises genuine question of fact regarding constitutionality of conditions of confinement); *Wright*, 387 F.2d at 526 (detention of an inmate in strip cell with no toilet paper unconstitutional), the record in the instant case does not support such a conclusion. It appears that the deprivation of toilet paper was inadvertent and that, at worst, Trammell was left with one roll of toilet paper to last approximately nine days and that the defendants were negligent in replenishing Trammell's supply. Negligence does not, however, satisfy the scienter requirement necessary to support a claim for "cruel and unusual punishment." *See Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir.1988) (inadvertent failure to replenish inmate's toilet paper supply for several days does not evidence mental state required to demonstrate Eighth Amendment violation). Deprivation of other toiletries for approximately two weeks—while perhaps uncomfortable—does not pose such an obvious risk to an inmate's health or safety to suggest that the defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they also drew] the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

Finally, Trammell relies on the Supreme Court's recent admonition that one "may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious." *Hope*, 536 U.S. at 738, 122 S.Ct. 2508. We find this reliance misplaced. As an initial matter, in *Hope*, the Supreme Court considered the use of a "hitching post" as a disciplinary tool. The prisoner was handcuffed to a rail at shoulder height for hours, shirtless and without adequate water in the Alabama sun, with his arms continuously held out to avoid the pain caused by the cuffs. *See id.* at 734–35 n. 2, 122 S.Ct. 2508. Given "the clear lack

of an emergency situation," the Court concluded that use of the hitching post in this manner could not be justified. *Id.* at 738, 122 S.Ct. 2508.

Unlike the defendants in *Hope,* who implemented a particularly harsh disciplinary measure with no regard for the inmate's health, the less severe disciplinary measure here was regularly monitored by a nurse in order to ensure that his health was not jeopardized by the various deprivations imposed in response to his misconduct. Under such circumstances, the risk of harm to Trammell was not "obvious," as was the case in *Hope.* Moreover, while the Court found that the disciplinary measures used in *Hope* had no penological utility because the disciplinary problem to which they responded had long subsided, the instant case involved ongoing and persistent misconduct by Trammell that the authorities were trying to correct. Consequently, we find that the disciplinary measures taken in this case directly and proportionally targeted Trammell's misconduct.

### III. *CONCLUSION*

For the foregoing reasons, we AFFIRM the judgment of the district court.

