In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2099

NATHAN GILLIS,

*Plaintiff-Appellant,*

*v.*

JON E. LITSCHER, GERALD A. BERGE,
Warden, BRADLEY HOMPE, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 02-C-463—**William C. Griesbach**, *Judge.*

ARGUED SEPTEMBER 28, 2006—DECIDED NOVEMBER 14, 2006

Before FLAUM, *Chief Judge*, and RIPPLE and EVANS, *Circuit Judges*.

EVANS, *Circuit Judge.* Stripped naked in a small prison cell with nothing except a toilet; forced to sleep on a concrete floor or slab; denied any human contact; fed nothing but "nutri-loaf"; and given just a modicum of toilet paper—four squares—only a few times. Although this might sound like a stay at a Soviet gulag in the 1930s, it is, according to the claims in this case, Wisconsin in 2002. Whether these conditions are, as a matter of law, only "uncomfortable, but not unconstitutional" as the State contends, is the issue we consider in this case.

Nathan Gillis alleges in this case, brought under 42 U.S.C. § 1983, that his rights under the Eighth and Fourteenth Amendments to the United States Constitution were violated while he was a prisoner at the Wisconsin Secure Program Facility at Boscobel.

The district court granted summary judgment for the defendants and Gillis appeals, raising two important issues. He contends there is a genuine issue of material fact precluding summary judgment both as to whether a Behavioral Modification Program (BMP) imposed on him for an infraction of the rules constituted cruel and unusual punishment in violation of the Eighth Amendment and whether the deprivation he suffered under the BMP was an atypical and significant hardship, thus implicating his due process rights.

The proposed findings of fact the parties filed with the district court tell the following story. The prison in Boscobel, dubbed the "Supermax," is Wisconsin's highest security prison. It is an all-segregation facility, designed to house recalcitrant inmates. At the relevant time, Supermax used a five-level system of inmate classification, with level one being the most restrictive. Inmates, including Gillis, were placed in level one upon their arrival at the prison. In this most restrictive level, inmates are allowed canteen items, hygiene products such as toothpaste, combs, and denture cleaners, legal materials, personal mail, religious items, clothing, and bedding. They are allowed three showers a week.

Gillis arrived at Supermax on February 15, 2002. Within 2 weeks of his arrival he was placed in the BMP for an infraction of what he sees as a relatively minor rule. The rule requires that inmates sleep with their heads toward the back of the cell (and the toilet). Gillis slept with his head toward the front of the cell and on occasion covered his head. He says that the rule was not being uniformly

enforced and that some inmates did not follow the rule because it forced them to lie with their heads next to the toilet. The defendants, various prison officers and agents, see it differently. They argue that compliance with the rule is necessary so guards can see an inmate's head through a small window on the cell door. If the guards cannot see the head of the inmate, they cannot determine his condition. Defendants also say that they began to enforce the rule on February 22, 2002, which is about a week before the BMP was imposed on Gillis. The toilets, they say, are "perfectly clean," so that cannot be the reason inmates sleep with their heads in the wrong direction. The security director did not classify this violation as a "major offense," but defendant Bradley Hompe, a unit supervisor, who was the moving force behind Gillis's placement, considered the violation to be major.

Whether "major" or "minor," it was for this infraction that Gillis was placed in the BMP. The BMP is a program designed to force difficult inmates to conform to the rules. The memo Gillis received upon being placed in the program is as follows:

> **Stage One:** You will be placed on stage one for a period of three days. All property will be removed from your cell during this time and you will receive nutri-loaf for meals.
>
> **Stage Two:** Upon completion of three days in stage one with appropriate behavior the Unit Manager may initiate stage two. Stage two will be in effect for 7 days. In stage two your in cell property will be limited to a segregation smock. You will receive regular meals. In stage two you will receive hygiene items two times per day and will receive showers on regular shower days. Upon completion of day 7 in stage two with appropriate behavior, the Unit Manager may deactivate the plan.
>
> ** Any inappropriate behavior, as described above, will

result in being placed on day one of stage one.

** Security restrictions may also alter this plan and will continue after deactivation of plan.

** This plan will be in effect for a period of six months and will be activated when you display inappropriate behavior as explained above.

** The Unit Manager may modify this plan at any time.

The warden's office received a copy of the memo, and Gillis's placement in the BMP was approved by Deputy Warden Peter Huibregtse.

After successful completion of the 3 days at stage one, Gillis would have been eligible to move to stage two, but he was continued in stage one for 2 more days because of his inappropriate behavior. He claims that appropriate behavior would simply have been lying on his bed in compliance with the rules. In his case, it appears that stage one was continued because of very bad, but possibly unrelated behavior—smearing blood and feces around his cell. The defendants say such behavior is related to the rule because guards cannot see through a feces-covered window. After 5 days, Gillis moved on to stage two, where he stayed for 7 more days.

In stage one, Gillis was deprived of nearly all human contact and sensory stimuli. He had no property in his cell and no privileges. He was stark naked and had no mattress or other bedding. He slept naked on the concrete floor or on the concrete slab that is the bed. He tried to sleep next to a heat vent, but the air from the vent was cool. He says he was so cold that he had to walk around his small cell some 14 hours a day trying to stay warm. He claims he developed sores on his feet from pacing and on his body from sleeping on the concrete and that his request for soap to clean his sores was denied. Defendants dispute that Gillis had to walk to keep warm. They say the temperature

in the cell was always 70 degrees or above, apparently in their view a temperature at which people sleep comfortably without pajamas or bedding.

Gillis was fed nutri-loaf—basically a ground-up block of food. He was denied mail, visitors, phone privileges, canteen items, writing materials, and use of the law library. There is a dispute of fact over the amount of toilet paper he received. He says he received it on only five occasions during the entire time he was in the BMP, and then it was four squares at a time. The defendants say he received toilet paper on request.

When he was placed in stage two, he was given what is called a sleeveless "seg smock," which is a one-piece item of clothing much like a poncho which covers a person from chest to below the groin. It is worn without underwear. Gillis also began to receive regular meals in styrofoam containers and a toothbrush and toothpaste, but no soap. He was finally allowed to shower 9 days into his ordeal. He was not given bedding or a mattress.

The program had an adverse effect on Gillis's mental stability. He heard voices telling him that "these people were trying to kill" him. He suffered panic attacks, with palpitations, shortness of breath, and a feeling that he was going to die. He became suicidal. He inflicted wounds on his body and wrote the words "help me" in blood on the walls of his cell. When a guard noticed the wounds and called the health services unit, Gillis was transferred to a different cell, where he further injured himself and began smearing feces on his cell walls and on the window. He was placed on clinical observation, but the conditions of his confinement did not change.

Gillis defines the BMP as a punitive measure unrelated to the conduct the officials were trying to correct. In his affidavit, Steve J. Martin, an independent consultant in corrections, says that the "BMP provided officials *carte*

*blanche* to circumvent, in a wholesale fashion, the provisions of Chapter DOC 303 [of the Wisconsin Administrative Code] . . . ." The defendants, on the other hand, say the BMP was not punitive; it was merely an attempt to convince Gillis to conform his behavior to the rules.

The Eighth Amendment prohibits cruel and unusual punishment and applies to the states through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660 (1962). To prevail on his Eighth Amendment claim, Gillis must show that the BMP imposed conditions which denied him "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *see also Wilson v. Seiter*, 501 U.S. 294 (1991). He must also show that the defendants acted with a culpable state of mind:

> [A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.

*Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

To succeed on his Fourteenth Amendment Due Process claim, Gillis must establish that he has a liberty interest in not being placed in the BMP—as it was administered to him—without procedural protections. It is undisputed that he received no procedural due process, so the claim turns on whether he can establish a liberty interest.

*Sandin v. Conner*, 515 U.S. 472 (1995), established that in evaluating whether a liberty interest exists, we must ask whether the conditions impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." At 484. Prior to *Sandin*, we had assumed that some conditions—while not constituting Eighth Amendment violations—would nevertheless establish a liberty interest. After *Sandin*, given the proliferation of

supermax, 23-hour lockdown prisons, it appeared that inmates would be hard-pressed to establish a liberty interest if the conditions in the most restrictive prison in a state, or perhaps in the nation, were to form the baseline and were considered the "ordinary incidents of prison life." We contemplated this issue in *Wagner v. Hanks*, 128 F.3d 1173, 1174 (7th Cir. 1997). We thought it would be

> difficult (we do not say impossible) to make disciplinary segregation sufficiently more restrictive than the conditions of the general population of such a prison to count as an atypical and significant deprivation of liberty—that is, to count as a substantial *incremental* deprivation—without scraping up against the Eighth Amendment's prohibition against cruel and unusual punishments.

In other words, how do prison officials make conditions in a supermax prison worse than usual without violating the Eighth Amendment?

After *Wagner* was decided, the Supreme Court determined in *Wilkinson v. Austin*, 545 U.S. 209, 125 S. Ct. 2384 (2005), that there can, in fact, be a liberty interest—short of an Eighth Amendment violation—triggering procedural requirements. The Court required the State of Ohio to provide limited due process protections before inmates could be transferred to its most restrictive prison. The Court noted the difficulty in identifying the proper baseline against which to measure conditions but said that assignment to the prison "imposes an atypical and significant hardship under any plausible baseline." At 2394. *Wilkinson* turns, however, not on denial of basic life necessities so much as on the extension of incarceration. The determining factors were that placement at the prison is of indefinite duration and it disqualifies an otherwise eligible inmate from consideration for parole. *Wilkinson* does not answer the question as to when the denial of life's necessities alone

could give rise to a liberty interest but still fall short of violating the Eighth Amendment. There is, as we said in *Wagner*, a "small space" between the two. In our case, we must determine whether we are standing in that small space or on either side of it. As we said, the district court answered the question by granting summary judgment for the defendants.

Our review of a grant of summary judgment is *de novo*. *Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003). Summary judgment can be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56. We must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

Determining whether Gillis's constitutional rights have been violated requires a "fact-intensive inquiry under constitutional standards," as in *Chandler v. Baird*, 926 F.2d 1057, 1064 (11th Cir. 1991), an Eighth Amendment case we have discussed with approval. *See Del Raine v. Williford*, 32 F.3d 1024 (7th Cir. 1994). In *Chandler*, the inmate was confined in a cell with no clothing except undershorts and with a plastic-covered mattress without bedding. The temperature in the cell was alleged to be as low as 60 degrees. The inmate contended that he sometimes slept huddled with a roommate, sleeping between two mattresses. The prison officials disagreed, saying that the cell was controlled by the same thermostat that controlled areas of the prison occupied by nurses and no one else complained about the temperature. They acknowledged, however, that the other people in these areas were fully clothed. The inmate also received no toilet paper for 3 days. The *Chandler* court vacated a grant of summary judgment for the prison officials and sent the case back to the district court for trial.

We now turn specifically to Gillis's Eighth Amendment claim. Under the amendment, life's necessities include shelter and heat, *Dixon v. Godinez*, 114 F.3d 640 (7th Cir. 1997), as well as hygiene items. *See Del Raine*. A lack of heat, clothing, or sanitation can violate the Eighth Amendment. *See Lewis v. Lane*, 816 F.2d 1165 (7th Cir. 1987) (an allegation of inadequate heating may state an Eighth Amendment violation); *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980) ("[A] state must provide . . . reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities (*i.e.*, hot and cold water, light, heat, plumbing)."); *Maxwell v. Mason*, 668 F.2d 361, 365 (8th Cir. 1981) (confinement in isolation without adequate clothing or bedding supports an Eighth Amendment claim: "clothing is a 'basic necessity of human existence'"). In *McCray v. Burrell*, 516 F.2d 357 (4th Cir. 1975), an inmate was confined 2 days in a cell where for part of the first night a concrete slab was his bed. A mattress was furnished later during that night, but no blankets were supplied. The inmate was so cold he tore open the mattress and slept inside it. He also was denied articles of personal hygiene. The court found a violation of the Eighth Amendment. Some conditions of confinement may establish an Eighth Amendment violation in combination when each alone would not do so. This is true when the deprivations have a mutually enforcing effect which produces the deprivation of a single, identifiable human need, such as food or warmth, for example "a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991).

When we asked the defendants' attorney at oral argument what case provides the strongest support for the proposition that the conditions of Gillis's confinement did *not* violate the Eighth Amendment, we were directed to *Trammell v. Keane*, 338 F.3d 155 (2nd Cir. 2003). The case fails to carry the day. In that case the issue was not whether the condi-

tions to which Trammell was subjected were sufficiently serious to deny him life's necessities, but rather his failure to show that the authorities acted with deliberate indifference. In addition, certain significant distinctions exist between that case and Gillis's. Trammell's behavior was significantly more uncontrollable. In a 5-week period he was cited for 16 disciplinary violations. Gillis had only been at Supermax for 2 weeks, and the rule he violated had only been uniformly enforced for about one week, before he was placed in the BMP. He had only one conduct report, and that grew out of the same behavior giving rise to his BMP—sleeping the wrong way on his bed. Furthermore, Trammell was able to receive a blanket and mattress after 48 hours if he stopped his misbehavior. Gillis could not regain his bedding while he was in the program, nor could he make the BMP stop once it was activated. Trammell never was denied all of his clothing. He was allowed one pair of undershorts—which, while probably not significant as to warmth, is significant as to dignity.

What the cases show is that the principle on which Gillis relies is well-established, and the inquiry as to whether there is a violation is fact-specific. Because of competing facts and inferences in this case, whether Gillis was denied the "minimal civilized measure of life's necessities" cannot be determined on summary judgment.

Summary judgment on the Eighth Amendment claim might still be proper, however, if Gillis cannot show that the defendants acted with disregard of the substantial risk of serious harm to him. Our review, though, convinces us that, on this issue as well, he must be allowed to proceed to trial. Defendants contend that placing Gillis on clinical observation shows that they did not disregard his safety. But nothing much changed for Gillis during clinical observation. Also, there is some indication in the record that the defendants saw the BMP in general as a way to deal with inmates without regard to the requirements of Chapter

DOC 303 of the Wisconsin Administrative Code. The Code outlines procedures to be used in placing inmates in adjustment status and does not, as far as we can see, have provisions for the sort of deprivation Gillis suffered. The BMP was imposed basically on Hompe's say-so, with the knowledge of the warden and deputy warden.

Gillis's case is one in which the

> plaintiff is entitled to have the trier of fact determine whether the conditions of his administrative confinement, principally with regard to the cell temperature and the provision of hygiene items, violated the minimal standards required by the Eighth Amendment.

*Del Raine*, at 1034.

We also note for the record that Gillis's case is not a situation analogous to civil contempt in that he holds the keys to his own fate. In contrast to cases such as *Rodriguez v. Briley*, 403 F.3d 952 (7th Cir. 2005), *Freeman v. Berge*, 441 F.3d 543 (7th Cir. 2006), or even, as we discussed above, *Trammell*, Gillis did not hold the keys to his own release. He may have held the keys to the final 2 days at stage one of his BMP, but not to the entire period. In contrast, Rodriguez could have corrected his situation immediately. He missed many meals because he refused to put his belongings in a storage box before leaving his cell to go to the cafeteria. He could have gone to meals immediately had he complied. We said:

> [W]e think that deliberate noncompliance with a valid rule does not convert the consequences that flow automatically from that noncompliance into punishment. Rodriguez punished himself.

403 F.3d at 952-53. Freeman refused to comply with a rule which required that inmates—who were in solitary confinement and fed in their cells—must be standing in the middle of their cells, with the lights on, wearing trousers or gym

shorts in order to get their food delivered. Freeman would not put his pants on and so was denied food. We said, "[T]here is a difference between using food deprivation as a punishment and establishing a reasonable condition to the receipt of food." 441 F.3d at 545.

The BMP is different. It is not simply a natural consequence "automatically" growing out of a rule infraction. It is much more elaborate. An inmate who refuses to put on his trousers can correct his situation immediately by putting them on. In contrast, defendants did not simply take Gillis's blanket away until he conformed with the rule. Once he received notice that he was to be put in the BMP, he had to complete the whole program; he couldn't make it stop. To say he could have avoided the program altogether by not breaking the rules in the first place would be to severely limit valid Eighth Amendment claims. One could say that most punishments could be avoided by simply following the rules. In a broader sense, no one would be in prison if everyone simply followed the rules. *Freeman* and *Rodriguez* are inapposite.

The inevitable conclusion that Gillis's due process claim also survives summary judgment follows from our discussion of his treatment under the BMP. Gillis may well be able to convince a jury that the program imposes an atypical and significant hardship even measured against the ordinary incidents of life at Supermax, thus establishing a liberty interest.

Also, defendants have not shown that they are entitled to qualified immunity. They cannot show that in 2002, when these events occurred, it was not well-established that denial of shelter, heat, and hygiene items implicated an inmate's constitutional rights.

As always in conditions of confinement cases, we are reluctant to interfere with the administration of the prisons. *See Mathews v. Eldridge*, 424 U.S. 319 (1976);

*Westefer v. Snyder*, 422 F.3d 570 (7th Cir. 2005). But our reluctance does not mean we can avoid our obligation to carefully evaluate constitutional claims, such as this one. In addition, we question how much this particular case will affect the administration of the prisons. It is unclear what exactly the status of the BMP program is at Supermax. Gillis contends that the policy "is currently in effect. . . . Inmates continue to be denied a hearing prior to placement on BMP." Defendants, with notable ambiguity, say that "[a]lthough the policy may still be in effect, the BMP program is no longer used" at Supermax.

The judgment of the district court is VACATED and this case is REMANDED for further proceedings consistent with this opinion.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—11-14-06