NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with
FED. R. APP. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted September 16, 2009[*]
Decided September 17, 2009

**Before**

JOEL M. FLAUM, *Circuit Judge*

TERENCE T. EVANS, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 09-1771

| | |
|---|---|
| DAVID ELIJAH BOWERS, JR., *Plaintiff-Appellant*, | Appeal from the United States District Court for the Eastern District of Wisconsin. |
| *v.* | No. 07-C-01 |
| WILLIAM POLLARD, et al., *Defendants-Appellees*. | William C. Griesbach, *Judge*. |

**O R D E R**

David Bowers, a former inmate at the Green Bay Correctional Institution in Wisconsin, sued the warden and several staff members under 42 U.S.C. § 1983, claiming that they confined him in conditions that violated his Eighth Amendment right to be free from cruel and unusual punishment and his Fourteenth Amendment right to due process. The district court granted summary judgment for the defendants, and we affirm.

---

[*]After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2).

Unless otherwise noted, the facts are not in dispute. Before entering Green Bay in November 2005, Bowers was housed at Dodge Correctional Institution, where he had a history of disruptive and self-harming behavior, including a propensity to insert objects into his penis. When Bowers swallowed a handful of pills and refused medical treatment, inserted teeth from a comb into his penis, and smeared feces in his cell, officials at Dodge sought to have him transferred to the Wisconsin Resource Center ("WRC"), a specialized mental-health facility. Just one week earlier, in evaluating Bowers's competency to stand trial, a private forensic psychiatrist had diagnosed him with "bipolar disorder with psychotic features" and advised that Bowers should receive psychiatric treatment and monitoring to ensure that he was taking his medications. But a prison psychologist had also evaluated Bowers around the same time and concluded that, although he occasionally exhibited psychotic symptoms, his behavior raised a strong possibility that he was malingering and using manipulative behavior to "get to and from WRC." WRC's admissions coordinator apparently shared this view: he refused to admit Bowers to the facility because he believed that Bowers, who had been at WRC before, was "manipulative and not psychotic" and purposely engaged in disruptive behavior so that officials would transfer him to his preferred facility. For reasons unclear from the record, Bowers was instead transferred to Green Bay, where he was placed immediately in observation status, a nonpunitive measure intended for "the temporary confinement of an inmate to ensure the inmate's safety and the safety of others." *See* Wis. Admin. Code. § DOC 311.01.

Bowers was loud and defiant from the moment he arrived at Green Bay, refusing orders to remove his clothing and announcing "David Bowers is in the house" and that staff would have to "deal with" him. Bowers met with staff psychologist Martha Breen-Smith several times during his first week, and he made vague threats to harm himself or others and warned that he would be her "nightmare" if he was not placed in the general population. By the end of that week, he finally was more compliant, and Dr. Breen-Smith released him from observation. Bowers was notified in writing, however, that because of his self-destructive and abusive actions, he was being placed on a "Behavioral Action Plan" ("BAP") and that, for "safety and security reasons," his property and privileges would be restricted. Under the terms of the initial BAP, his cell would be searched twice a week; he would receive bag meals and a "seg smock" (a one-piece poncho-like article of clothing that covers the body from the chest to below the groin, *see Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006)); he would be permitted to leave his cell for two hours each week to review mail and write letters and another two hours for clinical or group therapy; and he would be provided a towel and hygiene supplies on request.

Although there were brief periods of relative calm, Bowers was for the most part a recalcitrant and manipulative inmate. For example, on November 22, the day after the BAP

was implemented, Bowers was allowed outside of his cell to write letters but became angry when guards attempted to return him two hours later.  Once inside his cell, he used his mattress to block the door, smeared feces from his toilet on the cell windows, and, according to prison staff, said, "Let me keep writing and I'll stop smearing shit."  When guards were finally able to extract him and move him to a new cell, he again spread feces around the cell and also tried to shred a towel and tamper with the cell sprinkler head, threatened suicide, and, after cutting himself, smeared blood on the cell door.  Dr. Breen-Smith was called in to evaluate him and noted in her report that Bowers had momentarily agreed not to hurt himself further but promised to inflict self-harm in the future if not given the property he demanded.

Bowers frequently threatened to harm himself and often succeeded in carrying out the threats: he repeatedly inserted random objects into his penis, including toenail clippings, orange peels, bits of his mattress, cardboard from milk cartons, a ball-point-pen insert, a bandage, and pieces of metal from a dismantled sprinkler head.  He often banged his head against his cell wall and once bit his own arm to the point that he required hospitalization and later smeared feces in the wound.  He also regularly lashed out against guards until they threatened to subdue him with a Taser, and staff often needed to place him in five-point restraints—meaning they strapped him with velcro to a padded bench at the limbs and torso—in order to transport him to the hospital to assess his self-inflicted injuries or move him into a new cell after he had made his uninhabitable.  On one occasion Bowers threatened to put a ball-point-pen insert into his penis, but when guards threatened to move him to observation status, he said he never intended to hurt himself and had only made the threat because he was "ready to transfer" and "wanted to see a white shirt" (i.e., a supervising officer).  Another time he claimed to have placed a pen insert into his penis and a toothbrush in his rectum, but when a nurse attempted to examine him, he yelled: "That is sexual assault.  I'm going to sue you."  She did examine him, though, and he had not done what he claimed.  Bowers also, on at least four occasions, flooded or attempted to flood his cell by dismantling the sprinkler head or pouring toilet water on the floor.  He also regularly tried to take medications that were not his; once, when a guard administering medications came to his cell, Bowers wielded a handful of feces and, when the guard stepped back to avoid being hit, Bowers grabbed and ingested handfuls of pills from the medicine cart.

Despite Bowers's consistently difficult behavior, the BAP was reevaluated at least 21 times between November 2005 and July 2006 and various property and privileges were restored—albeit usually only temporarily—when Bowers demonstrated that he would not abuse them.  For example, his mattress was taken away when he tried to stuff pieces of it into his penis but was returned to him when his behavior cooled.  Then when he used the mattress to block his cell window, stood on it to dismantle the sprinkler head, or again

destroyed it and inserted pieces into his penis, it was taken away again. Similarly, he was allowed to have headphones in his cell until he threatened to harm himself with the ear buds, and he was provided milk cartons with his meals until he tried to insert shreds of the cartons into his penis.

It is undisputed that, on at least fifteen occasions between November 2005 and July 2006, guards placed Bowers in five-point restraints to prevent his self-destructive behavior and kept him restrained for up to twelve hours at a time, the maximum amount of time an inmate may be immobilized without the recommendation of a psychologist or psychiatrist. *See* Wis. Admin. Code § DOC 306.11(3)(e). Although guards threatened him several times with a Taser, they used it only once during a chaotic attempt to extract Bowers from his flooded cell. On at least one other occasion, guards tried unsuccessfully to subdue Bowers with a "one-second burst" of an incapacitating agent.

Bowers was eventually transferred to Columbia Correctional Institution, and he filed this lawsuit pro se in November 2006. The district court screened his complaint, *see* 28 U.S.C. § 1915A, and allowed Bowers to pursue his claim that the conditions of his confinement under the BAP were unconstitutional. When the defendants moved for summary judgment, the district court appointed counsel for Bowers. After discovery and a second round of briefing, the district court granted summary judgment for the defendants on all claims. In a comprehensive 34-page opinion, the court first concluded that the conditions imposed in the BAP did not rise to the level of a denial of life's necessities or result in wanton or unnecessary infliction of pain. The court explained that, although the conditions may have "deprived him of some dignity," they were imposed only to "prevent Bowers's self-abusive behavior and protect him from himself." Next, although counsel for Bowers had not even developed the argument, the district court analyzed whether his placement in the BAP violated due process and concluded that there was no genuine factual dispute on the issue. The district court also observed that Bowers had spent the bulk of his brief in opposition to summary judgment arguing that the defendants had been deliberately indifferent to his need for mental-health treatment. But Bowers had not included this claim in his complaint or supported it with evidence at summary judgment, and the court thus concluded that any such argument was not properly before it. And, in any event, the court explained, Bowers had not identified what treatment, if any, he had received at Green Bay or explained why it was deficient and thus had not raised a genuine factual dispute on the issue. This pro se appeal followed.

We review the district court's grant of summary judgment de novo, construing all facts and reasonable inferences in favor of Bowers, the opposing party. *See Gillis*, 468 F.3d at 492. As an initial matter, we note that Bowers has once again spent much of his brief trying to argue that the defendants were deliberately indifferent to his need for mental-health

treatment. Although the theory was discussed in Bowers's submissions in opposition to summary judgment, Bowers neither raised a claim of deliberate indifference in his complaint nor did he, through his actions during the lawsuit, litigate the claim. *See Hancock v. Potter*, 531 F.3d 474, 480 (7th Cir. 2008); *Torry v. Northrop Grumman Corp.*, 399 F.3d 876, 879 (7th Cir. 2005); *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002). In any event, the record sheds little light on Bowers's mental-health treatment at Green Bay. At summary judgment he produced no evidence that the treatment he did receive was deficient, nor did counsel try to develop the conflicting evidence concerning whether Bowers actually suffers from a serious mental illness or is simply adept at manipulation. And without evidence on these points, summary judgment for the defendants would have been appropriate even if Bowers had raised a claim about his mental-health treatment.

We turn, then, to Bowers's remaining arguments: that the conditions of confinement imposed on him through the Behavioral Action Plan violated his rights under the Eighth and Fourteenth Amendments. We deal first with the latter argument, which has no legs. The Fourteenth Amendment does not "confer a right to a predeprivation hearing in every case in which a public officer deprives an individual of liberty or property." *Holly v. Woolfolk*, 415 F.3d 678, 680 (7th Cir. 2005). Rather, a prisoner has a liberty interest in avoiding particular conditions of confinement only if those conditions pose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005) (quoting *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995)). Here, there is simply no evidence that any of the conditions of the BAP, such as the denial of a mattress in response to Bowers's attempts to use it for self-harm, posed an atypical hardship.

The objections Bowers has to the conditions of the BAP are better conceptualized under the Eighth Amendment. To succeed on a claim under the Eighth Amendment, Bowers needed to present evidence from which a factfinder could conclude, first, that the conditions of his confinement resulted in "'the denial of the minimal civilized measure of life's necessities,'" and, second, that the defendants were deliberately indifferent to the conditions in question, meaning that they knew of and disregarded an excessive risk to Bowers's health or safety. *See Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The general conditions of Bowers's confinement are not in dispute: under the terms of the BAP he was at times allowed only a "seg smock" or paper gown, sometimes denied a mattress or blanket, and, on as many as fifteen occasions, left in five-point restraints for as long as twelve hours at a time. Bowers likens these conditions to those in *Gillis*, 468 F.3d at 489-91. In that case the inmate was placed in a punitive "Behavioral Modification Program" for no reason other than violating a prison rule requiring him to sleep with his head toward the back of his cell. *Id.* at 489-90. For the first five days of the program, the inmate was deprived of human contact, left naked with no

mattress or other bedding in a cell so cold he paced fourteen hours each day to stay warm, fed only a ground-up block of food, and denied access to toilet paper. *Id.* at 490-91. The following week he was finally allowed some clothing and regular meals but still denied a mattress or bedding, and he was not allowed to shower until the ninth day of the program. *Id.* at 491. Further, the inmate could not return to normal conditions simply by behaving himself; once the program was initiated, he was required to complete the entire course of punishment. *Id.* at 494-95. This evidence, we concluded, was sufficient to permit the inmate to survive summary judgment on a claim that the conditions of his confinement were unconstitutional. *Id.* at 493-95.

Bowers's case is a far cry from *Gillis*. First, the Behavioral Modification Plan in *Gillis* was a punitive response to a minor infraction, and the inmate was required to complete the entire twelve-day plan before returning to normal conditions. Here, in contrast, the restrictions imposed on Bowers were non-punitive and designed instead to prevent him from harming himself or others, and the terms of the plan were reevaluated on a regular basis, sometimes as often as four times a month. Although the denial of such basic items as a mattress or clothing may seem harsh in the abstract, we cannot evaluate prison conditions in a vacuum. *See, e.g., Scarver v. Litscher*, 434 F.3d 972, 976-77 (7th Cir. 2006); *Bruscino v. Carlson*, 854 F.2d 162, 164-65 (7th Cir. 1988). When Bowers was given a mattress, he tore it up and inserted pieces into his penis or stood on it and dismantled the sprinkler system. He destroyed a blanket, tore up paper gowns, persistently spread feces around his cell, and harmed or threatened to harm himself with any item he could get his hands on. When he destroyed property or used it for self-harm, it was temporarily taken away but returned when his behavior stabilized. Bowers did not present evidence from which a factfinder could conclude that the terms of the BAP were anything other than a justified and well-tailored response to his repeated attempts to destroy property or use it to hurt himself.

Finally, to the extent that Bowers asserts that guards used excessive force by attempting to subdue him with five-point restraints, incapacitating agents, and a Taser, he again failed to present evidence sufficient to survive summary judgment. To succeed on an excessive-force claim, Bowers had to demonstrate that the defendants inflicted punishment "maliciously and sadistically for the very purpose of causing harm." *See Wilson v. Seiter*, 501 U.S. 294, 302 (1991) (quotation marks and citations omitted); *see also Harper v. Albert*, 400 F.3d 1052, 1065 (7th Cir. 2005). Although Bowers alleged that he was restrained with "steel handcuffs" so tight that his hands turned purple and lost feeling, the defendants submitted evidence—including video footage of Bowers being restrained—that the restraints in question are made of Velcro. And, in any event, there is no evidence that guards used force against Bowers to punish him; the record demonstrates that force was used only to protect guards during cell extractions or to prevent Bowers from harming himself.

AFFIRMED.