In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 22-2870

ANTONIO M. SMITH,

*Plaintiff-Appellant,*

*v.*

JOHN KIND, *et al.,*

*Defendants-Appellees.*

---

Appeal from the United States District Court for
the Eastern District of Wisconsin.
No. 2:18-cv-01569-PP — **Pamela Pepper,** *Chief Judge.*

---

ARGUED DECEMBER 6, 2024 — DECIDED MAY 30, 2025

---

Before HAMILTON, SCUDDER, and LEE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Nearly 50 days into a hunger strike, Antonio Smith refused a correctional officer's order to exit his cell for a daily wellness check. So for three days, officers entered Smith's cell, assisted him into a wheelchair, and transported him to the prison's health unit—all without incident. But perhaps frustrated by the noncompliance, Captain Jay Van Lanen changed course on day four by resorting to pepper spray for the extraction, knowing that Smith had a

medical contraindication to the spray. Smith reacted to the spray by gasping for breath for about eight minutes, only then to find himself placed naked in a cold cell for the next 23 hours. Because we conclude that a jury could find that both actions—using pepper spray and housing Smith in the frigid cell—lacked a legitimate penological purpose and thus violated the Eighth Amendment, we disagree with the district court's grant of summary judgment for the defendants on that ground. But in the end, troubled though we are by what Smith endured, the principle of qualified immunity leads us to affirm.

## I

### A

At the summary judgment stage, we view the facts in the light most favorable to the nonmoving party, here Antonio Smith. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). By his telling, the situation unfolded as follows.

In October 2017 Smith began a prolonged hunger strike to protest prison conditions at Green Bay Correctional Institution in Wisconsin. Pursuant to prison policy, Smith had reported to the prison's health unit for 45 days, each time declining to submit to a wellness check. On day 46, however, he declined to leave his cell, believing that prison policy allowed a nurse to come to him. A nurse did indeed go to Smith's cell that day to document his refusal to submit to the wellness check.

The following day correctional officers once again directed Smith to leave his cell to go to the health unit. Having received authorization to use force to gain Smith's compliance, a correctional officer entered the cell with a taser drawn

as Smith lay prone on his bed in a so-called "surrendering ritual"—hands behind his back, legs crossed at the ankles, and facing the wall. An extraction team followed closely behind and placed Smith in handcuffs and leg restraints before sitting him in a mobile restraint chair, essentially a wheelchair, which allowed them to transport him to the health unit. Smith continued to refuse orders to leave his cell, so the team followed this same procedure the next day. And when Smith refused for the fourth time, a new correctional officer, Captain Jay Van Lanen, took charge of the extraction and repeated the same process.

But on November 28, 2017, when Smith refused to walk to the health unit for the fifth time, the process changed again. For reasons not clear in the record, the officers elected to videotape this extraction. So although we continue to view genuine factual disputes in favor of Smith, we will defer to the video footage if it "firmly settles a factual issue." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018).

Captain Van Lanen gathered a four-man extraction team outside the restrictive housing unit where Smith was housed. He stated that the extraction techniques used the previous three days were no longer suitable. Elaborating, Van Lanen said that Smith had "an extensive violent history with assigning hits on the streets to have people killed, assault[ing] within the prison system, and assault[ing] in general throughout his prison career." Smith had also grown accustomed to the previous extraction method, Van Lanen observed, and the team had no way of knowing whether he had a weapon in his cell. Finally, Van Lanen explained that, because Smith was on a hunger strike, it was important to observe whether he could walk to the health unit, rather than be wheeled in a restraint

chair. On that basis, he believed it necessary to alter their approach for this extraction, adding that, although Smith had a medical contraindication to pepper spray, Security Director John Kind had authorized its use.

Donning full tactical gear, the extraction team entered the housing unit and approached Smith's cell. Lying on his bed, Smith removed his blanket to allow the officers to see his full body and assumed the so-called surrendering ritual. For five minutes, Captain Van Lanen urged Smith to come to the cell door. Smith ignored the instruction.

Van Lanen then informed Smith of his intent to use pepper spray to gain compliance and reminded him about his contraindication to the spray. When Smith did not budge, Van Lanen deployed a burst of the spray through his cell window, immediately triggering Smith's asthma. The video shows that, for eight minutes, Smith had difficulty breathing, seemed disoriented, and was drooling, coughing, spitting, and moaning. While Smith continued to gasp for air, Van Lanen ordered him to remove his clothes and comply with a strip search. Although he struggled to compose himself, Smith obeyed the order.

After handcuffing Smith, still naked, the extraction team covered his genitals with a towel. They then helped him to his feet and walked with him down the hallway to the health unit where he refused a shower and wellness check. Instead of returning Smith to his cell, as done the three previous days, the officers placed him in a "control cell" used for disruptive inmates. Van Lanen informed Smith he could request a shower and soap at any time and said he would return to discuss "clothing and stuff." This discussion occurred around noon on November 28.

Smith offered evidence that the control cell was very cold the night of November 28. By his account, the heating vent blew air equivalent to the outside temperature, which, during his stay in the cell, ranged from 25 to 57 degrees Fahrenheit. All the while, the control cell had no mattress or bedding, and Smith no clothes. And although Captain Van Lanen's past practice involved placing a smock, clothing, and other permitted property in a security box attached to the cell regardless of whether an inmate requests such items, he did not do so for Smith.

Three and a half hours after being placed in the cell, Smith requested clothing, bedding, and a mattress from Lieutenant Timothy Retzlaff. He also complained of the cold and asked to be moved to a warmer cell. Retzlaff informed Smith that he needed to check with Captain Van Lanen. Twelve hours later, another officer approached Smith and proposed an offer: if Smith submitted to future medical evaluations, he could have a smock; if not, he would remain naked and cold. Smith declined the offer.

Smith continued waiting for Lieutenant Retzlaff to return with word from Captain Van Lanen. But word never came. So day turned to night. And night turned to day. And 23 hours after Van Lanen placed him in the control cell, there Smith remained, naked and freezing. He described his time in the cell as painful, adding that he could not sleep and spent most of the 23 hours on his feet.

B

In time Smith invoked 42 U.S.C. § 1983 and filed a complaint in federal court alleging that various correctional officers violated his constitutional rights. After screening, the

district court allowed him to proceed on his Eighth Amendment excessive force claims against Captain Van Lanen for using pepper spray and Security Director John Kind for authorizing its use; an Eighth Amendment conditions-of-confinement claim against Van Lanen and Lieutenant Retzlaff stemming from Smith's night in the control cell; and an Eighth Amendment excessive force claim against officers Alexander Bonis, John Diedrick, and Cole Meyer for alleged misconduct during their escort of Smith to the health unit following the use of pepper spray. The defendants moved for summary judgment on each claim, and the district court, seeing no Eighth Amendment violations, granted their motion in its entirety.

Smith now appeals.

## II

Summary judgment is appropriate when there is "no genuine dispute as to any material fact," and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In reviewing the district court's summary judgment ruling, we proceed on "a clean slate, drawing all reasonable inferences from the record in favor of [Smith] as the non-movant." *Xiong v. Bd. of Regents of Univ. of Wis. Sys.*, 62 F.4th 350, 353 (7th Cir. 2023).

Smith alleges three Eighth Amendment violations. A viable Eighth Amendment claim contains both an objective and subjective component. See *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective component requires Smith to show that the officers' actions were "objectively 'harmful enough' to establish a constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting *Wilson v. Seiter*, 501 U.S. 294, 303

(1991)). As for the subjective component, Smith must establish that the defendants "acted wantonly and with a sufficiently culpable state of mind." *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994) (citing *Wilson*, 501 U.S. at 297).

The defendants urge us to affirm the district court's ruling that they acted at all times in good faith, without wantonness and within constitutional bounds. They also invite us to affirm on the alternative ground of qualified immunity. We travel the latter path.

"The doctrine of qualified immunity" is an affirmative defense that "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Once a defendant raises the defense, "it becomes the plaintiff's burden to defeat it." *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008).

To overcome qualified immunity, Smith must clear two hurdles. First, he must show that the officers violated his constitutional rights. Second, he must demonstrate that those rights were clearly established at the time of the violation. See *Pearson*, 555 U.S. at 232. Courts have discretion to begin with the second step to refrain from ruling on potentially difficult constitutional questions. See *id.* at 236. This approach, the Supreme Court has explained, aligns with principles of constitutional avoidance and can save "substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case." *Id.* at 236–37.

But skipping the first question has its drawbacks. Continued avoidance of constitutional questions, the Supreme Court

likewise has recognized, stunts the development of constitutional precedent. See *id.* at 236 (recognizing that following "the two-step procedure promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable"); *Camreta v. Greene*, 563 U.S. 692, 704–06 (2011) (observing that constitutional avoidance "sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo" and explaining that "constitutional determinations" in qualified immunity cases are "self-consciously designed" to "establish[] controlling law and prevent[] invocations of immunity in later cases").

This downside is especially evident when we look to the demanding standard for showing that a right is "clearly established": a plaintiff must point to "existing precedent" that puts the "statutory or constitutional question beyond debate"—no doubt a monumental task if there is little constitutional precedent to consider. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Recognizing that both approaches have a proper time and place, the Supreme Court leaves it to the "sound discretion" of the lower courts to determine the order of decision. See *Pearson*, 555 U.S. at 236.

We exercise that discretion here to consider the first prong and resolve whether Smith demonstrated a constitutional violation for each of his three claims. Doing so allows us to clarify Eighth Amendment law in our circuit and establish future constitutional boundaries to what, if Smith's account is taken as true, we see as a serious and disproportionate correctional response to an inmate's noncompliance with an officer's directives. See *Camreta*, 563 U.S. at 705 (explaining that the

purpose of allowing courts the discretion to reach the constitutional question is "to promote clarity—and observance—of constitutional rules").

## A

## 1

We begin with Smith's Eighth Amendment excessive force claims arising from the use of pepper spray. Smith advances this claim against Captain Van Lanen, the correctional officer who deployed the spray and led the cell-extraction efforts, as well as John Kind, the Green Bay prison's Security Director. Because Smith has provided no evidence that Kind acted with wantonness in authorizing Van Lanen's use of force to facilitate his extraction, we affirm the district court's grant of summary judgment in Kind's favor. The analysis for Van Lanen is not so straightforward, however.

Captain Van Lanen does not dispute that his use of pepper spray satisfies the objective harm component of Smith's Eighth Amendment claim. So we consider only whether he acted with the requisite intent—wantonness. See *Wilson*, 501 U.S. at 302. "Wantonness," the Supreme Court has explained, "does not have a fixed meaning but must be determined with 'due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986)). Experience shows that excessive force claims often arise in contexts where correctional officers are required to act "in haste, under pressure, and frequently without the luxury of a second chance," such as in quelling a riot or other disturbance. *Whitley*, 475 U.S. at 320. Correctional officers "must balance the threat unrest poses to inmates, prison workers,

administrators, and visitors against the harm inmates may suffer if guards use force." *Hudson*, 503 U.S. at 6.

Recognizing the difficulty of balancing these competing concerns, the Supreme Court has held that Eighth Amendment excessive force claims require a "very high state of mind": a correctional officer's use of force only qualifies as "unnecessary and wanton infliction of pain" if it is applied not "in a good-faith effort to maintain or restore discipline," but "maliciously and sadistically to cause harm." *Wilson*, 501 U.S. at 302; *Hudson*, 503 U.S. at 6.

Because direct evidence of intent rarely exists, several factors inform whether "the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321. Those factors include examining the need for force, the threat posed by the inmate as reasonably perceived by the responsible official, the relationship between the need for force and the amount of force used, and any efforts made to temper the severity of a forceful response. See *id.*; see also *Hudson*, 503 U.S. at 7. Applying these factors, we conclude that a reasonable jury could infer that Captain Van Lanen's deployment of pepper spray into Smith's cell under the circumstances presented here was malicious and sadistic.

We, of course, recognize that correctional officers have broad leeway to exercise force when a situation presents a threat to immediate safety. See *Whitley*, 475 U.S. at 321 (explaining that deference to prison administrators "carries special weight" when the "'ever-present potential for violent confrontation and conflagration' ripens into *actual* unrest and conflict" (citation omitted) (quoting *Jones v. N.C. Prisoners'*

*Lab. Union, Inc.*, 433 U.S. 119, 132 (1977)); *Lewis v. Downey*, 581 F.3d 467, 477 (7th Cir. 2009) (observing that aggressive behavior "increases the need for force and often poses a threat to the security officers"). But viewing the facts in Smith's favor, as we must, a jury could find that he posed no such threat at the time Captain Van Lanen deployed pepper spray into his cell.

Remember, foremost, that officers had entered Smith's cell to facilitate his extraction for three straight days before Captain Van Lanen chose to resort to pepper spray. Each of those extractions proceeded without incident in the same routine way, and nothing in the record suggests that Smith acted aggressively toward correctional officers or threatened violence in the future. To be sure, in the pre-extraction meeting, Van Lanen stated that Smith had a history of assaultive behavior while in prison. But the summary judgment record contains no documented instances of Smith engaging in any violence while incarcerated. And Smith, for his part, insists that he had no history of violence while incarcerated.

But even on the generous assumption that Van Lanen's perception that Smith had a history of violent behavior was reasonable, see *McCottrell v. White*, 933 F.3d 651, 668–69 (7th Cir. 2019), on this record we have a hard time seeing his decision to change course—to shift from entering Smith's cell without incident to using pepper spray to which Smith had a medical contraindication—as justified. For starters, if Smith had a reputation of being assaultive on the day Van Lanen used pepper spray, then he surely had that reputation the day before. Van Lanen, however, offered no explanation for why Smith's alleged past behavior did not deter him from entering Smith's cell the previous day. So we are puzzled as to what prompted Van Lanen to discontinue a successful extraction

method in favor of one that he knew could cause complications for Smith's health.

Nor can we lose sight of the bigger picture: a four-man extraction team donned full tactical gear and faced a single, unarmed inmate, lethargic after reportedly starving himself for more than 50 days. See *Lewis*, 581 F.3d at 477 (considering that an inmate "was merely lying on his bunk, weak and sluggish from more than ten days without food" when analyzing a correctional officer's need for force); see also *Abbott v. Sangamon County*, 705 F.3d 706, 727 (7th Cir. 2013) (discussing the "general proposition" that using pepper spray on a subdued subject is excessive).

Captain Van Lanen also attempted to justify his resort to pepper spray by suggesting that Smith may have had a weapon. But here too we see, and Van Lanen has identified, no evidence supporting that speculation: Smith was in restrictive housing, had not used or threatened to use a weapon during previous extractions, and his hands were visible and empty at all times. Van Lanen has likewise failed to explain why his concern about Smith harboring a weapon suddenly developed—he extracted Smith from his cell without pepper spray and without incident just the day before.

Still, we recognize that an immediate threat to safety is not the only circumstance in which a correctional officer can appropriately use force. The Supreme Court has emphasized many times over that correctional officers receive special deference in their approach to restoring or maintaining order and discipline. See, *e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 547 (1979); *Whitley*, 475 U.S. at 322; *Hudson*, 503 U.S. at 6. That deference applies not only to materialized threats to prison order and inmate misconduct, like fighting or rioting, but also to

preventative measures intended to avoid future disturbances. See *Whitley*, 475 U.S. at 322.

We applied this same principle to reverse a district court's determination that prison officials' use of mace on inmates who repeatedly refused orders to exit their cells violated the Eighth Amendment. See *Soto v. Dickey*, 744 F.2d 1260, 1271 (7th Cir. 1984). The correctional officers in *Soto*, like here with Smith, issued what seemed like non-emergency directives to inmates locked in their cells. See *id.* at 1265–67. But the similarities between the two cases end there.

Many of the inmates in *Soto* had well-known and documented histories of assaulting prison guards and other inmates. See *id.* at 1265. The events leading to the use of pepper spray often involved situations where inmates prone to throwing items (like meal trays) at guards refused to turn over the objects. See *id.* at 1265–66. Put simply, it gives analogy a bad name to see the inmates in *Soto* as like Smith, who was 50 days into a hunger strike and had no demonstrated history of violence within the prison. And while correctional officials entered Smith's cell three days in a row without incident, the maximum-security prison in *Soto* had developed its policy of using pepper spray as the first response to an inmate's refusal to leave his cell after careful analysis and consideration of the unit's history of disruption and the inmates' past use of makeshift weapons. See *id.* at 1262–65, 1267.

Captain Van Lanen nevertheless insists that, like the guards in *Soto*, he was justified in using pepper spray once Smith refused his orders because "[i]nmates cannot be permitted to decide which orders they will obey, and when they will obey them." *Id.* at 1267. At that level of generality, we agree—inmates may not pick and choose which orders to

obey. But an inmate's passive disobedience, without more, does not in and of itself authorize unrestrained or extreme escalation of force. See *Treats v. Morgan*, 308 F.3d 868, 872–73 (8th Cir. 2002) ("Not every instance of inmate resistance justifies the use of force, and use of pepper spray will not be justified every time an inmate questions orders or seeks redress for an officer's actions." (citations omitted)). Instead, we consider an inmate's disobedience, along with the surrounding "facts and circumstances," to determine whether a particular use of force was necessary. *Soto*, 744 F.2d at 1270. Here, several factors—particularly Smith's weakened condition and the history of peaceful and successful extractions on three preceding days—could lead a reasonable jury to find that Van Lanen's use of pepper spray was unnecessary.

Our conclusion that the need for Van Lanen to resort to pepper spray was relatively low informs the corollary analysis of the relationship between the need for force and the amount of force used. If there was little need for force, then even a small amount of force may be disproportionate. See *McCottrell*, 933 F.3d at 667 ("Obviously, if there was *no* need for the warning shots, then those shots were significantly disproportionate to the need for force.").

Many inmates may experience pepper spray as a relatively minor use of force. See *Soto*, 744 F.2d at 1262 ("Without exception, the institutional officials and officers were of the opinion that the use of mace was much more humane and effective than a flesh to flesh confrontation with an inmate."); see also *Roberson v. Torres*, 770 F.3d 398, 406–07 (6th Cir. 2014) (explaining that whether use of pepper spray is preferable to a physical altercation depends on the circumstances). And courts, including ours, have sanctioned the use of pepper

spray on noncompliant inmates. See, *e.g.*, *Soto*, 744 F.2d at 1270; *Staples v. Gerry*, 923 F.3d 7, 17–18 (1st Cir. 2019).

But Smith was not the typical inmate. See *Segrain v. Duffy*, 118 F.4th 45, 61 (1st Cir. 2024) (explaining that the "type of physical reaction an incarcerated person has to the pepper spray" matters in an Eighth Amendment excessive force analysis). Not only was he 50 days into a hunger strike, but he also had a documented history of asthma, making the resort to pepper spray all the more dangerous. See *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("Asthma, depending upon its degree, can be a serious medical condition."). Captain Van Lanen knew of this danger.

In the final analysis, based on Smith's version of events, we conclude that a reasonable jury could find in his favor on the excessive force claim against Captain Van Lanen. The evidence supports a "reliable inference" that Van Lanen knew that Smith—on the verge of starvation, with no documented history of violence while incarcerated—posed no credible threat to officer safety or prison administration. *Whitley*, 475 U.S. at 322. From there a jury could determine that Van Lanen's opting for a method of force that he knew Smith had a medical contraindication to was so disproportionate to the risks that it could not "plausibly have been thought necessary" and "instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 321.

2

Having determined that a jury could find that Van Lanen violated Smith's constitutional rights, we move to the second prong of the qualified immunity analysis: whether that right

was clearly established. See *Pearson*, 555 U.S. at 232. It is on this prong that Smith falls short. The fact intensive inquiry that led us to conclude that Van Lanen's actions violated his right to be free from excessive force precludes us from determining at the requisite level of specificity that the constitutional violation was clearly established enough as to put Van Lanen on notice.

State correctional officers are immune from liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 78–79 (2017) (per curiam)). For a law to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 580 U.S. at 79 (quoting *Mullenix*, 577 U.S. at 12); see *Sabo v. Erickson*, 128 F.4th 836, 844 (7th Cir. 2025) (en banc). Put differently, save for the "rare 'obvious'" violation, Smith must identify a case that "every reasonable official would interpret … to establish the particular rule" he seeks to apply. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).

Smith cannot clear this high bar. Returning our attention to *Soto*, he contends that Captain Van Lanen violated his clearly established right by using "mace or other chemical agents in quantities greater than necessary." 744 F.2d at 1270. But the Supreme Court has cautioned courts against reasoning from broad principles when considering whether a right is clearly established for qualified immunity purposes. See *Kisela*, 584 U.S. at 104. Especially in excessive force cases, where "it is sometimes difficult for an officer to determine

how the relevant legal doctrine … will apply to the factual situation the officer confronts," correctional officers are entitled to qualified immunity "unless existing precedent 'squarely governs' the *specific* facts at issue." *Id.* (emphasis added) (quoting *Mullenix*, 577 U.S. at 308–09); see also *Smith v. Finkley*, 10 F.4th 725, 742 (7th Cir. 2021) (observing that specificity is "particularly important" in excessive force cases, "as it can be difficult to determine how the law will apply to a factual situation").

After examining the specific facts before us, we cannot conclude that a reasonable correctional officer would have known that using pepper spray to extract Smith from his cell violated the Eighth Amendment. Indeed, in *Soto*—the only controlling case Smith relies on—we held that the correctional officer *could* deploy pepper spray on non-compliant inmates. See 744 F.2d at 1270–71. No other precedent from our court or the Supreme Court addresses circumstances close enough to those here to defeat qualified immunity.

Nor does Smith's documented medical contraindication to pepper spray change the outcome. While a close call, we do not view Smith's account of what transpired here, though very concerning, as falling within that narrow category of cases where the constitutional violation is so severe and blatant as to be obvious. See *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (holding that correctional officers were not entitled to qualified immunity for handcuffing an inmate to a hitching post for seven hours in extreme heat because "the Eighth Amendment violation was obvious"); *Taylor v. Riojas*, 592 U.S. 7, 8–9 (2020) (per curiam) (reversing a court of appeals's decision that granted correctional officers qualified immunity for housing an inmate in a sewage-filled, frigidly cold cell for four

days because any reasonable officer would know such conditions offend the Eighth Amendment).

We therefore affirm the district court's grant of summary judgment for Captain Van Lanen on Smith's Eighth Amendment excessive force claim.

B

1

We next consider whether the conditions Smith faced during his 23 hours in the control cell violated the Eighth Amendment. Here too we conclude that a jury could find in Smith's favor.

The Constitution allows restrictive and even harsh conditions of confinement. See *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). What the Constitution does not allow, however, is a deprivation "of the minimal civilized measure of life's necessities." *Id.* A prison official who denies an inmate an "identifiable human need such as food, warmth, or exercise," *Wilson*, 501 U.S. at 304, "violates the Eighth Amendment upon exhibiting 'deliberate indifference to a substantial risk of serious harm to an inmate,'" *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021) (quoting *Farmer*, 511 U.S. at 828). To succeed on his Eighth Amendment claim, then, Smith must show that Lieutenant Retzlaff and Captain Van Lanen denied him a human need and did so with deliberate indifference.

Because warmth is one such need, "prisoners have a right to protection from extreme cold." *Dixon v. Godinez*, 114 F.3d 640, 642 (7th Cir. 1997). Whether an inmate's exposure to cold rises to a constitutional level depends on "the severity of the cold; its duration; whether the prisoner has alternative means to protect himself from the cold; the adequacy of such

alternatives; as well as whether he must endure other uncomfortable conditions as well as cold." *Id.* at 644. This fact-intensive inquiry "will often be peculiarly appropriate for resolution by the trier of facts." *Id.* at 643.

Smith spent almost 24 hours in a cell equivalent to the temperature outside. And despite the temperature reaching below freezing at night, he was left naked—given no clothes, no bedding, and no way to protect himself from the cold. See *Wilson*, 501 U.S. at 304 (observing that a low cell temperature at night plus failure to issue blankets can combine to create unconstitutional conditions of confinement). Smith explained that the extreme cold he experienced overnight caused him pain and prevented sleep. On these facts, Smith has done enough to create a genuine dispute of material fact as to whether these conditions meet the "constitutionally necessary minimum protection against severe cold." *Dixon*, 114 F.3d at 644.

The question then becomes whether Smith has presented evidence that Captain Van Lanen and Lieutenant Retzlaff acted with deliberate indifference. This requires us to determine if a reasonable jury could conclude that the two defendants had actual knowledge that Smith faced "a substantial risk of serious harm" to his health or safety and, if so, what steps they took to respond to that risk. *Farmer*, 511 U.S. at 847.

Beginning with Captain Van Lanen, a few observations lead us to conclude that a reasonable juror could find that he was deliberately indifferent to Smith's exposure to extreme cold. *First*, he placed Smith naked in a cold cell surely knowing that it was November 28 in Green Bay, Wisconsin when the temperature would (and did) drop below freezing. Van Lanen did so with full awareness of Smith's weakened state

and pepper spray-induced asthma attack. *Second*, Van Lanen chose not to follow his usual practice of making a smock and bedding available to Smith in the control cell. Nor did he ever return to the cell that night to discuss clothing, even though he promised Smith he would do so.

Viewing these facts in the light most favorable to Smith, a juror could reasonably conclude that Van Lanen was aware of the risk of serious harm to Smith—left naked in a frigid cell overnight—but did nothing, making him deliberately indifferent to that risk. *Id.* at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." (citation omitted)); see also *id.* at 842 ("[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.").

The analysis is even more straightforward for Lieutenant Retzlaff. Smith asked Retzlaff to provide him with clothes and bedding or move him to a warmer cell. Retzlaff did neither. A jury could therefore infer that he was deliberately indifferent to the serious health risk arising from Smith's exposure to extreme cold.

2

Again though, when it comes to defeating a qualified immunity defense, establishing a constitutional violation is only one step, not the finish line. Smith must also show that the conditions of the control cell were unconstitutional "beyond

debate." *Ashcroft*, 563 U.S. at 741. It is at this step that Smith's claim again falls short.

Our case law is clear on the general proposition that inmates have a well-established constitutional right to protection from extreme cold. See, *e.g.*, *Henderson v. DeRobertis*, 940 F.2d 1055, 1059 (7th Cir. 1991). But this statement sweeps too broadly for qualified immunity purposes. To overcome the officers' immunity defense, Smith needs to show that the specific conditions he faced in the control cell were unconstitutional.

Once we view the situation at the appropriate level of particularity, we can locate no case that "squarely governs" Van Lanen's or Retzlaff's conduct. *Brosseau*, 543 U.S. at 201. Before today, we had never held it unconstitutional on closely analogous facts to house an inmate in a cell that ranged in temperature from 25 to 57 degrees over a 23-hour period without clothes or a way to keep warm.

To be sure, Smith points us to a number of cases where we determined that cold cell conditions violated an inmate's Eighth Amendment rights. But the temperature in those cases was more extreme, see, *e.g.*, *Henderson*, 940 F.2d at 1057 (four days of subzero temperature); *Del Raine v. Williford*, 32 F.3d 1024, 1031 (7th Cir. 1994) (temperature reached 50 degrees below zero during an inmate's strip search), or the duration extended far beyond 23 hours, see, *e.g.*, *Lewis v. Lane*, 816 F.2d 1165, 1166, 1171 (7th Cir. 1987) (cell temperature was around 53 degrees for two months). And while we credit the pain and extreme discomfort Smith says he experienced, we cannot conclude that this constitutional violation was so "obvious" as to avoid the need to point to a closely analogous case. *Wesby*, 583 U.S. at 63 (quoting *Brosseau*, 543 U.S. at 199).

That leaves us to affirm the district court's grant of summary judgment for Van Lanen and Retzlaff on Smith's conditions-of-confinement claim.

C

Smith's final claim concerns the escort from his cell to the health unit after the pepper spray incident. He contends that members of the extraction team—Alexander Bonis, John Diedrick, and Cole Meyer—exercised excessive force by placing him in chokeholds and bending his wrists. We agree with the district court's conclusion that Smith's characterization of his escort is "contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Video footage of the extraction confirms that the officers did not behave maliciously while escorting Smith. Because he had difficulty sustaining his own weight, two officers supported Smith by his arms. And despite Smith's assertion otherwise, the video shows no dragging, chokeholds, or other misconduct. There being no violation of the Eighth Amendment, we affirm the district court's grant of summary judgment for the defendants on this claim.

*   *   *

For these reasons, we AFFIRM the district court's grant of summary judgment for the defendants on each of Smith's claims.

HAMILTON, *Circuit Judge*, concurring in part and dissenting in part. I agree with most of the analysis and holdings in Judge Scudder's opinion for the court. I agree that a jury could find that defendant Van Lanen violated the Eighth Amendment by using the pepper spray against plaintiff Smith, at least where Van Lanen knew of plaintiff's special vulnerability to that weapon, but that Van Lanen is entitled to qualified immunity on that claim. I also agree that, given the video evidence, we must affirm summary judgment on plaintiff's excessive force claim based on the guards' moving plaintiff to the control cell.

I also agree with the majority's holding that plaintiff offered evidence that would allow a jury to find that defendants Van Lanen and/or Retzlaff imposed conditions of confinement on plaintiff that violated his Eighth Amendment rights. Plaintiff has provided evidence that the defendants intentionally placed him and left him for hours in a cold cell without clothing or blankets or other protection. The majority's holding that a jury could find this deliberate exposure of a prisoner to extreme cold without protection to have been cruel and unusual punishment is clear and important. And the majority wisely chooses to use our discretion to decide step one of the qualified immunity analysis—the merits of the claims—on both the pepper spray claim and the conditions of confinement claim.

I. *Qualified Immunity and Deliberate Exposure to Cold*

With respect, however, I must dissent from the majority's decision to affirm summary judgment for defendants Van Lanen and Retzlaff on the claim for deliberate exposure to cold based on the defense of qualified immunity. The majority reaches that conclusion by applying what the Supreme Court

has called "a rigid, overreliance on factual similarity." *Hope v. Pelzer*, 536 U.S. 730, 742 (2002). As the majority explains here: "Before today, we had never held it unconstitutional on closely analogous facts to house an inmate in a cell that ranged in temperature from 25 to 57 degrees over a 23-hour period without clothes or a way to keep warm." Ante at 21. That observation is literally correct but certainly should not be decisive. It loses sight of the long-established and more general standard for qualified immunity: whether a reasonable official in the defendant's position would have understood that his actions were unlawful. E.g., *Ziglar v. Abbasi*, 582 U.S. 120, 152 (2017); *Hope*, 536 U.S. at 739; *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Manery v. Lee*, 124 F.4th 1073, 1080 (7th Cir. 2025); *Doxtator v. O'Brien*, 39 F.4th 852, 863 (7th Cir. 2022).

Prisoners have a well-established right not to be subjected to extreme cold, at least without protection from it. For purposes of summary judgment and this appeal, we must assume that these defendants deliberately placed a prisoner "in a cell that ranged in temperature from 25 to 57 degrees over a 23-hour period without clothes or a way to keep warm." Ante at 21. As the majority opinion explains, several pieces of evidence—including defendant Van Lanen's typical practice of providing inmates with a smock, his failure to return to discuss clothing with Smith, and the Green Bay weather in late November—would allow a reasonable jury to infer that Van Lanen, Retzlaff, or both were deliberately indifferent to plaintiff Smith's unprotected exposure to the cold. I respectfully submit that it should have been obvious to a reasonable prison official that such conditions violate a prisoner's right not to be subjected to cruel and unusual punishment.

The Supreme Court and our court have long recognized that where the constitutional violation is sufficiently obvious, a plaintiff need not always point to a case that is factually on all fours. *Hope,* 536 U.S. at 740–41; *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (collecting cases and explaining: "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."); *Schimandle v. Dekalb County Sheriff's Office*, 114 F.4th 648, 655 (7th Cir. 2024) (plaintiff need not point to an "identical case"); *Lopez v. Sheriff of Cook County*, 993 F.3d 981, 988 (7th Cir. 2021) ("The prong-two clearly-established-law assessment does not require a case with identical factual circumstances, lest qualified immunity become absolute immunity."), citing *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). Plaintiff has offered evidence that defendants chose to punish his misconduct by, in effect, refrigerating him—naked and unprotected—for hours. Plaintiff's evidence is that Van Lanen or Retzlaff or both deliberately exposed him to that cold for purposes of "control." That last word is a euphemistic way of saying they deliberately subjected him to a practice widely recognized in law as a form of torture to coerce him to change his behavior.

The proper question for qualified immunity is whether a reasonable prison official would have understood it to be unlawful to deliberately expose a naked prisoner to cold conditions in an effort to coerce different behavior. I think the answer is obviously yes. That is the answer based on elementary notions of human decency and dignity. And the answer does not depend on exactly how cold it was or exactly how many hours the prisoner suffered.

If more specific support is needed for the proposition that it is obviously unconstitutional to deliberately subject a naked prisoner to temperatures equivalent to and colder than a refrigerator, I offer that support in three forms. First, United States law and international covenants to which the United States is a party recognize that deliberately subjecting a prisoner to extreme cold is a form of torture. This means that the actions alleged here could be found to have violated both United States and international law. Second, a good deal of prior case law deals with prison officials trying to manage when prison heating systems break down or when poor maintenance of prison buildings makes them difficult to heat adequately. The general principles applied in those cases should have made it obvious that *deliberately* subjecting a naked prisoner to extreme temperatures is beyond the pale of arguably tolerable conduct. A third form of support is the complete absence of any attempt here, by defendants or the majority opinion, to argue how an official in this situation might have thought this deliberate refrigeration of a naked human being could have been permissible.

II.  *The Law and Practice of Torture*

Federal law makes it a crime for a person to engage in torture outside the United States. Torture Act, 18 U.S.C. §§ 2340 & 2340A. Torture is defined as "an act committed by a person acting under the color of law specifically intended to inflict severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon another person within his custody or physical control." § 2340(1). The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (most familiar to our court from immigration cases and widely known

as the CAT), to which the United States is a party, defines torture as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 1, Dec. 10, 1984, S. Treaty Doc. No. 100–20, 1465 U.N.T.S. 113–14; see also 8 C.F.R. § 208.18(a)(1) (incorporating a very similar definition into domestic law for asylum purposes); Torture Victim Protection Act of 1991, 106 Stat. 73 § 3(b)(1), note following 28 U.S.C. § 1350 (defining torture in similar terms in statute creating private right of action against torturers).

Deliberately exposing a naked prisoner to extreme cold as asserted here easily fits within both definitions. For the reasons explained in the majority opinion, a jury could find that the defendants "specifically intended to inflict severe physical or mental pain or suffering" on plaintiff Smith while he was in their custody. 18 U.S.C. § 2340(1). A jury could likewise

find that plaintiff was placed in the literally freezing control cell, in order to punish him for an act he committed, "with the consent or acquiescence of a public official or other person acting in an official capacity" in violation of the CAT.

The torture definitions in both the Torture Act and the CAT exclude pain and suffering inflicted as part of "lawful sanctions," but to my knowledge, there is no plausible claim here of any explicit or implicit authority in law to deliberately expose naked Wisconsin prisoners to extreme cold as part of their sentences. Defendants have not tried to argue here that they were authorized by law to deliberately refrigerate a naked prisoner. The defendants have argued instead that plaintiff has the facts wrong, but that is a matter for trial rather than summary judgment.

Extensive international authorities make the point that these general definitions of torture encompass deliberate use of extreme cold to cause pain and suffering. The United Nations Committee Against Torture monitors implementation of the CAT. It has long explained that "using cold air to chill" can amount to torture under the Convention. Rep. of the U.N. Committee Against Torture, *Israel* ("*Report on Israel*"), U.N. GAOR, 52nd Sess., Supp. No. 44 at 38 ¶ 257, U.N. Doc. A/52/44 (Sept. 10, 1997). The same Committee Against Torture also adopted a similar finding from a local human rights body regarding practices in Mexico, explaining that torture in prison included "being undressed and kept in a freezing, air-conditioned room for days at a time." U.N. Committee Against Torture, 30th Sess., *Report on Mexico* at 35–36 ¶ 165, U.N. Doc. CAT/C/75 (May 26, 2003). More generally, the United Nations Special Rapporteur of the Commission on Human Rights observed in 2004: "The jurisprudence of both international and

regional human rights mechanisms is unanimous in stating" that interrogation methods including "using cold air to chill" violate the "prohibition of torture and ill treatment." U.N. Special Rapporteur of the Commission on Human Rights, *Torture and other cruel, inhuman, or degrading treatment or punishment*, ¶ 17, U.N. Doc. A/59/324 (Sept. 1, 2004), quoting *Report on Israel*, supra, at ¶ 257.

United States case law on the *deliberate* use of cold against prisoners is, thankfully, relatively sparse, but the available case law clearly indicates it can be a form of torture and that courts virtually take for granted the fact it is unlawful.[1] In *Lhanzom v. Gonzales*, 430 F.3d 833 (7th Cir. 2005), for instance, this court remanded a person's claim for relief under the Convention Against Torture based on State Department reports documenting torture of Chinese prisoners in Tibet, including "electric shocks, exposure to cold, and severe beating." *Id.* at 848–49, citing U.S. Department of State, *2005 Country Report on Human Rights Practices: China* (March 8, 2006) (https://perma.cc/39K2-Z35H).

Several other cases support the principle. In *Al Shimari v. CACI Premier Technology, Inc.*, 300 F. Supp. 3d 758 (E.D. Va.

---

[1] Members of this court had no difficulty finding that conduct including deliberate exposure of detainees to cold air could amount to torture in *Vance v. Rumsfeld*, 701 F.3d 193, 205–06 (7th Cir. 2012) (en banc) (Wood, J., concurring in the judgment); *id.* at 213 (Hamilton, J., dissenting). The *Vance* majority did not disagree, but did not decide the issue only because the defense in that case did not even try to dispute whether the conduct alleged, including "prolonged exposure to cold," amounted to torture. *Id.* at 196 (en banc majority); see also *Vance v. Rumsfeld*, 653 F.3d 591, 597, 610–11 (7th Cir. 2011) (vacated panel opinion) (noting that the plaintiffs' cells were kept "intolerably cold" and that such conditions were clearly unlawful).

2018), the plaintiffs had been prisoners at the infamous Abu Ghraib complex operated by the United States in Iraq. Plaintiffs offered evidence that U.S. military contractors had subjected them to a range of abuses that amounted to torture, including "using cold air to chill." *Id.* at 781–82 (internal quotation marks omitted); see also *id.* at 764, 769, 770 (describing conduct in that case, including deliberately imposed cold). The court carefully reviewed United States and international law and allowed some claims to go forward on the theory that the defendants purposefully aided violations of international law by facilitating abuses that amounted to torture and/or cruel, inhuman, or degrading treatment. See, e.g., *id.* at 777–82 (determining jurisdiction under torture statutes). It explained that "international law and domestic executive and military sources … clearly identify the abuse experienced by plaintiffs as torture." *Id.* at 781.[2]

Similarly, in *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62 (D.D.C. 1998), a group of former political hostages

---

[2] Courts and executive agencies have likewise characterized as torture the use of cold water in interrogation and/or confinement. See, e.g., *In re Estate of Marcos Human Rights Litigation*, 910 F. Supp. 1460, 1463 (D. Hawaii 1995) (characterizing as torture the practice of forcing a "detainee while wet and naked to sit before an air conditioner often while sitting on a block of ice"); U.S. Department of State, *2005 Country Report on Human Rights Practices: Egypt* (March 8, 2006) (https://perma.cc/8T3X-3NJF) (torture practices included "dousing victims with cold water"); U.S. Department of State, *2004 Country Report on Human Rights Practices: Yemen* (Feb. 28, 2005) (https://perma.cc/35NF-V9PX). While leaving an inmate wet *and* cold is distinct from just cold, these authorities further support the idea that a reasonable official should have known it is unlawful to place a naked inmate in freezing or near-freezing conditions.

brought claims alleging torture by Iranian officials. One plaintiff was kept chained on a balcony for an entire winter, during which he developed frostbite on his hands and feet. *Id.* at 66. The court ruled that he had been "tortured" as defined by an old version of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(e) (1997), and entered default judgment for the plaintiffs. *Id.* at 69.

Weighed against these authorities, which are only a sample of a broad international literature on the law and practice of torture, I have found no contrary authorities suggesting that deliberate exposure of a prisoner, especially a naked prisoner, to extreme cold is an accepted and lawful means of punishment. In other words, I find no legal foundation for a prison official in these defendants' circumstances to have believed his actions could have been lawful.

I am not suggesting that conditions of confinement falling short of torture are acceptable under the Eighth Amendment. But our qualified immunity analysis should recognize actionable violations, without qualified immunity, when officials deliberately impose conditions that amount to torture. See *Padilla v. Yoo*, 678 F.3d 748, 763 & n.10 (9th Cir. 2012) (stating that "the unconstitutionality of torturing a United States citizen was 'beyond debate' by 2001" and collecting authorities for the principle).

III. *Broken Furnaces and Drafty Prisons*

A more extensive body of case law concerns prison heating systems that failed in cold weather or drafty prison buildings that were difficult to keep humanely warm in cold weather. The majority cites several of these cases. See ante at

21, citing *Del Raine v. Williford*, 32 F.3d 1024, 1031 (7th Cir. 1994); *Henderson v. DeRobertis*, 940 F.2d 1055, 1059 (7th Cir. 1991); *Lewis v. Lane*, 816 F.2d 1165, 1171 (7th Cir. 1987). It nonetheless concludes that they do not control the outcome here because they do not show that it is unlawful to "house an inmate in a cell that ranged in temperature from 25 to 57 degrees over a 23-hour period without clothes or a way to keep warm." Ante at 21.

Respectfully, that conclusion misses the point of the cases that is most relevant here. We made clear decades ago in these cases that when a prisoner is being subjected to temperatures like those alleged here—for any reason, including without fault of prison officials—prison officials have a duty to take corrective measures, such as providing extra protective clothing and bedding and repairing heating systems or buildings within a reasonable time. See, e.g., *Henderson*, 940 F.2d at 1059–61 (qualified immunity reversed when prison heating system malfunctioned and defendants took four days to fix it; collecting cases for principle that constitution requires prisoners to "be provided with adequate heat and shelter"); *Lewis*, 816 F.2d at 1171 (vacating summary judgment when plaintiffs provided evidence that defendants maintained cell block between 52 and 54 degrees for several months).

The Supreme Court made the same point more than thirty years ago, writing as self-evident that "a low cell temperature at night combined with a failure to issue blankets" may establish an Eighth Amendment violation. *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). More recent decisions from this court have reaffirmed the point. See, e.g., *Hill v. Nicholson*, 829 F. App'x 141, 142 (7th Cir. 2020) (plaintiff stated Eighth Amendment claim when officers let him take only cold showers and his cell block

was "extremely cold"); *Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013) ("[W]e have observed that jails must meet minimal standards of habitability. This includes adequate bedding and protection from cold, both of which were allegedly lacking here."); *Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996) (reversing dismissal when prison officials failed to provide blankets despite "extremely cold indoor air temperature").

Those cases did not draw bright lines based on exactly how cold was too cold or exactly how long the cold conditions lasted. They did make clear that prison officials have a duty under the United States Constitution to respond quickly with protective clothing and bedding. The broken-furnace/drafty-cell cases cannot reasonably be read as offering any support for the cruel idea that a prison official could *deliberately* subject a naked and unprotected prisoner to extreme cold for any length of time.

We recognized that point in *Gillis v. Litscher*, 468 F.3d 488 (7th Cir. 2006), a case with facts extraordinarily similar to this case. In *Gillis*, Wisconsin prison officials left an inmate naked in his cell—without clothing, bedding, or a mattress—for five days as part of a "Behavioral Modification Program." *Id.* at 489–90. The cell's vent blew cold air, and the prisoner said that he had to walk around his cell for 14 hours a day just to stay warm. *Id.* at 490. We found that the plaintiff had created an issue of fact sufficient to get his Eighth Amendment claim past summary judgment. We specifically addressed the intentional nature of the defendants' conduct, explaining that some evidence in the record indicated that the prison officials used Behavioral Modification Programs "as a way to deal with inmates without regard" for Wisconsin law. *Id.* at 494. We also rejected the defendants' qualified immunity defense,

explaining tersely that it was well-established that "denial of shelter, heat, and hygiene items implicated an inmate's constitutional rights." *Id.* at 495.

*Gillis* helps show why qualified immunity is inappropriate here. In this case, as in *Gillis*, prison officials altered the conditions of confinement to motivate a change in inmate behavior. In both cases, the change involved a denial of clothing and prolonged exposure to cold air. The deliberate choice by prison officials to expose inmates to chilling conditions was then—and is still now—a clear violation of the Eighth Amendment.

*Gillis* is a rare case because, as noted, case law on *deliberate* exposure of unprotected prisoners to cold is thankfully sparse. But our case law makes unequivocally clear that prisoners have a right to adequate heat. Similarly, the *Lhanzom*, *Al Shimari*, and *Cicippio* cases discussed above all recognized deliberate exposure of a prisoner to extreme cold as a form of torture. And *Gillis* made clear that cold conditions cannot be constitutionally used as part of prison discipline.

IV. *The Absence of a Counter-Theory*

My third form of support comes from the absence of any theory, from these defendants or from the majority opinion, as to how these defendants might reasonably have thought they could lawfully refrigerate a naked human being for hours.

One might respond that the burden to defeat qualified immunity is on the plaintiff, not the defendant. That's true as a matter of law. But it is equally true that the plaintiff need not always come forward with case law showing that the same or even closely analogous conduct has been held unlawful

where the violation is obvious. The canonical case on this point is *Hope v. Pelzer*, where the Supreme Court reversed a grant of qualified immunity despite the absence of closely analogous case law. 536 U.S. at 744–46. The violation was so "obvious" that the unlawfulness of the punishment should have been apparent to a reasonable prison official. *Id.* at 741.

The plaintiff in *Hope* was an Alabama prisoner who had allegedly engaged in misconduct while on a chain-gang road crew. As punishment, he had his shirt removed, was shackled to a post in a painful position, and was left in the Alabama sun for seven hours with very little water. The Supreme Court held that the illegal character of that punishment was sufficiently obvious that qualified immunity was not available. *Id.*

The Court of Appeals in *Hope* had reasoned, much like the majority opinion here, that qualified immunity applied unless plaintiff could show a finding of a constitutional violation in a previous case on facts "'materially similar' to Hope's situation." *Id.* at 739, quoting *Hope v. Pelzer*, 240 F.3d 975, 981 (11th Cir. 2001). The Supreme Court said this "rigid gloss" on the qualified immunity standard was "not consistent with our cases." *Id.* It explained that the contours of an asserted constitutional right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful…." *Id.*, quoting *Anderson*, 483 U.S. at 640.

The ruling in *Hope* was not a simple "we know it when we see it" reaction to disturbing facts. The Court took care to look at other cases and administrative actions concerning the Alabama practice of shackling prisoners uncomfortably in the

heat as punishment, finding that the defendants had ample notice that the practice was not permissible under the law. 536 U.S. at 741–45. The signals in those cases and administrative actions were similar to the signals relevant here, from both the "cold as torture" authorities and the broken-furnace and drafty-cell cases.

We do not need a case exactly on point to reject the qualified immunity defense here, at least on the facts we must treat as true on appeal. While I am pleased to join most of the majority opinion, including its important holding that the alleged intentional exposure to cold was sufficient to violate the Eighth Amendment, I respectfully dissent from the portion of the opinion and judgment affirming summary judgment on the conditions of confinement claim based on qualified immunity.