# SUPREME COURT OF THE UNITED STATES

ANTONIO M. SMITH *v.* JOHN KIND, ET AL.

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

No. 25–943.   Decided June 29, 2026

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting from the denial of certiorari.

In late November in Green Bay, Wisconsin, two prison officials intentionally locked petitioner Antonio Smith in a freezing-cold prison cell, naked and without any way to keep warm for 23 hours. The Seventh Circuit held that the officers violated Smith's Eighth Amendment right to be free from cruel and unusual punishment but nevertheless granted them qualified immunity, reasoning that the Circuit "had never held it unconstitutional on closely analogous facts to house an inmate in a cell that ranged in temperature from 25 to 57 degrees over a 23-hour period without clothes or a way to keep warm." 140 F. 4th 359, 372 (2025). The Circuit's grant of qualified immunity is clearly wrong, and I would summarily reverse.

I

This case was resolved by the courts below on the officers' motion for summary judgment, so the facts must be viewed in the light most favorable to Smith as the nonmoving party. *City and County of San Francisco* v. *Sheehan*, 575 U. S. 600, 603 (2015). In October 2017, when Smith was an inmate at the Green Bay Correctional Institution in Wisconsin, he began a hunger strike to protest prison conditions. For the first 45 days of the hunger strike, Smith reported to the prison's health unit daily but declined to submit to a wellness check once there. Starting on day 46,

Smith declined to leave his cell at all and instead laid on his bed in a "'surrendering ritual.'" 140 F. 4th, at 363. As a result, on that day, and for the following three days, correctional officers restrained Smith and lifted him into a wheelchair to transport him to the health unit. *Ibid.*

On day 50, which was in late November, Smith again refused to leave his cell. This time, correctional officer Captain Jay Van Lanen told his team that the prior method of extracting Smith from his cell was "no longer suitable" and that he believed it necessary to change their approach by using pepper spray. *Ibid.* Van Lanen added that Security Director John Kind had authorized the use of pepper spray even though Smith has asthma and pepper spray can cause severe complications for those with asthma. When Van Lanen arrived at Smith's cell, he told Smith he would use the pepper spray to "gain compliance" if Smith did not stand and walk to the health unit and reminded Smith about his asthma. *Ibid.* Smith did not respond and laid down in his surrendering-ritual position. Van Lanen then deployed the pepper spray. Video evidence shows that "for eight minutes, Smith had difficulty breathing, seemed disoriented, and was drooling, coughing, spitting, and moaning." *Ibid.* "While Smith continued to gasp for air, Van Lanen ordered him to remove his clothes and comply with a strip search." *Ibid.* Smith obeyed. Van Lanen and four other officers then handcuffed Smith (who was still naked), covered his genitals with a towel, and walked him to the health unit, where Smith declined a shower and wellness check.

Afterwards, instead of returning Smith to his cell and permitting him to put his clothes back on, the officers placed Smith, still naked, in a "'control cell' used for disruptive inmates." *Id.*, at 364. A vent in the cell "blew air equivalent to the outside temperature, which, during his stay in the cell, ranged from 25 to 57 degrees Fahrenheit." *Ibid.* The cell itself had no mattress or bedding, and Van Lanen did not give Smith any clothing, even though his past

practice had been to provide a smock and other clothing regardless of whether the inmate had requested it.

When Smith was first placed in the cell around noon, Van Lanen told Smith that Smith could request a shower any time and that he would come back to discuss "'clothing and stuff,'" but he never returned. *Ibid.* Three and a half hours later, Smith requested clothing, bedding, and a mattress from Lieutenant Timothy Retzlaff and asked to be moved to a warmer cell given the cold. Retzlaff said he would check with Van Lanen. Twelve additional hours went by with no word from Van Lanen or Retzlaff. Then, around 3 o'clock in the morning, a different officer told Smith that if he submitted to future wellness checks, he could have a smock, but that otherwise, "he would remain naked and cold." *Ibid.* Smith declined. Another eight hours came and went without any word from Van Lanen or Retzlaff. Smith remained naked and frigid overnight as the temperature dropped below freezing to 25 degrees. After 23 hours, prison staff removed Smith from the cell. Smith later stated that he stayed on his feet for most of those 23 hours because it was too painful to sit, lie down, or sleep.

Smith sued Van Lanen and Retzlaff under 42 U. S. C. §1983, alleging three Eighth Amendment claims: first, that the use of pepper spray was excessive force; second, that the conditions of his confinement in the control cell constituted cruel and unusual punishment; and third, that the officers used excessive force while escorting him from his cell to the health unit. The only claim at issue in Smith's petition for a writ of certiorari is Smith's second claim regarding his confinement in the control cell.

## II

### A

To begin, the Court of Appeals for the Seventh Circuit correctly held that a reasonable jury could find that the officers violated Smith's Eighth Amendment right by

"den[ying] him a human need and [doing] so with deliberate
indifference" when they placed him naked in a freezing cell
for nearly 24 hours without any clothing, bedding, or other
way to protect himself from the cold.  140 F. 4th, at 371.
The Seventh Circuit explained that a reasonable jury could
find that both officers acted with deliberate indifference to
Smith's exposure to the extreme cold.  *Ibid.*  The evidence,
construed in Smith's favor, showed that Van Lanen "placed
Smith naked in a cold cell surely knowing that it was No-
vember 28 in Green Bay, Wisconsin when the temperature
would (and did) drop below freezing," and "did so with full
awareness of Smith's weakened state and pepper spray-in-
duced asthma attack."  *Ibid.*  He also "chose not to follow
his usual practice of making a smock and bedding availa-
ble" and never "return[ed] to the cell that night to discuss
clothing, even though he promised Smith he would."  *Ibid.*
As for Retzlaff, the Circuit held that the "analysis [was]
even more straightforward" because "Smith asked Retzlaff
to provide him with clothes and bedding or move him to a
warner cell," and "Retzlaff did neither."  *Id.*, at 371–372.

The Seventh Circuit's conclusion is reinforced by the fact
that the officers did not assert in their briefs to the Seventh
Circuit or to this Court any legitimate penological reason to
subject Smith to such conditions.  See Brief in Opposition
12–14; Brief for Defendants–Appellees in No. 22–2870
(CA7), ECF Doc. 15, pp. 33–38.  Nor could they.  The Court
has long held that prison officials violate the Eighth
Amendment when they are deliberately indifferent to the
deprivation of a prisoner's basic needs, that is, when they
"kno[w] of and disregar[d] an excessive risk to inmate
health or safety."  *Farmer* v. *Brennan*, 511 U. S. 825, 837
(1994).  It logically follows that prison officials also violate
the Eighth Amendment when they not only know of a dep-
rivation of a prisoner's basic needs but intentionally deprive
him of those needs to force him to comply with an unwanted

medical evaluation or procedure when the prisoner poses no threat to others.

### B

Despite holding that a jury could find a violation of Smith's Eighth Amendment rights, the panel majority, over Judge Hamilton's dissent, nonetheless concluded that the officers were entitled to qualified immunity because the Seventh Circuit "had never held it unconstitutional on closely analogous facts to house an inmate in a cell that ranged in temperature from 25 to 57 degrees over a 23-hour period without clothes or a way to keep warm." 140 F. 4th, at 372; see *id.*, at 378 (Hamilton, J., dissenting) (arguing that the case law "makes unequivocally clear that prisoners have a right to adequate heat"). The Circuit erred in granting the officers qualified immunity simply because no prior case had found an Eighth Amendment violation based on subjecting prisoners to the exact same combination of cold temperature and duration as occurred here.

Qualified immunity shields government officials from liability if their actions do not "'violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rivas-Villegas* v. *Cortesluna*, 595 U. S. 1, 5 (2021). "'[T]his Court's case law does not require a case directly on point for a right to be clearly established'"; instead, "'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Ibid.*

It is "beyond debate" that the officers' actions here violated the Eighth Amendment. *Ibid.* It is well established that officers may not "deprive inmates of the minimal civilized measure of life's necessities," *Rhodes* v. *Chapman*, 452 U. S. 337, 347 (1981), or deny a prisoner an "identifiable human need such as food, warmth, or exercise" by, for example, subjecting him to "a low cell temperature at night" while "fail[ing] to issue blankets," *Wilson* v. *Seiter*, 501 U. S. 294, 304 (1991). Officers also may not inflict "'unnecessary

and wanton'" pain, which is pain that is "'totally without penological justification.'" *Rhodes*, 452 U. S., at 346.

As Judge Hamilton explained in dissent, the Seventh Circuit has itself held that intentionally subjecting prisoners to extreme cold conditions without any way to stay warm violates the Eighth Amendment. 140 F. 4th, at 377–378. In *Gillis* v. *Litscher*, 468 F. 3d 488 (CA7 2006), for example, the Circuit held that a reasonable jury could find that prison officials violated a prisoner's Eighth Amendment right when they deliberately left him naked in a cell blowing cool air for five days as part of an effort to "conform [his conduct] to the rules." *Id.*, at 490; see *Del Raine* v. *Williford*, 32 F. 3d 1024, 1031 (CA7 1994) (officers deliberately strip-searched prisoner in cell for 15 to 30 minutes when windchill was 40 to 50 degrees below zero).[1] The Seventh Circuit has also held that, when cold conditions are the product of heating-system failures, officers violate the Eighth Amendment if they are aware of such conditions and fail to take corrective measures such as providing an alternative way to keep warm. See *Dixon* v. *Godinez*, 114 F. 3d 640, 642, 644–645 (1997) (40 degrees all winter and prisoner was given only long underwear, cap, gloves, jacket, two sheets, and blanket); *Lewis* v. *Lane*, 816 F. 2d 1165, 1166, 1171 (1987) (cell temperature allegedly around 53 degrees for two months); *Murphy* v. *Walker*, 51 F. 3d 714, 720–721 (1995) (*per curiam*) (confined in cell without clothes, blankets, or mattress in the middle of November for 1.5 weeks).

Based on the principles established by this Court and the like precedent in the Seventh Circuit, no reasonable officer could have concluded that intentionally placing Smith in the control cell completely naked with no clothing, bedding, or additional way of keeping warm for 23 hours in freezing

--------

[1] The Fifth Circuit has also found Eighth Amendment violations on similar facts. See, *e.g.*, *Palmer* v. *Johnson*, 193 F. 3d 346, 349, 353 (1999) (prisoners kept outside in temperature below 59 degrees for 17 hours without "shelter, jacket, blanket, or source of heat").

conditions was constitutionally permissible.  The panel majority reached the opposite conclusion, however, by discounting that body of law on the ground that each case involved a temperature or a timeframe that did not perfectly match the "25 to 57 degrees over a 23-hour period without clothes" scenario here.  140 F. 4th, at 372.  That was error.

This Court has emphasized that "'clearly established law' should not be defined 'at a high level of generality'" and that courts should look to prior cases involving "similar circumstances," *White* v. *Pauly*, 580 U. S. 73, 79 (2017) (*per curiam*), but this analysis does not permit discarding every case that presents any factual variation.  On the contrary: The core of the inquiry has always centered on whether the """contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right."'" *Brosseau* v. *Haugen*, 543 U. S. 194, 199 (2004) (*per curiam*).  A "body of relevant case law" may clearly establish those contours even if no single case, on its own, presents identical facts.  *Ibid.*; see *District of Columbia* v. *Wesby*, 583 U. S. 48, 63 (2018) (law may be clearly established by either "'controlling authority' or 'a robust "consensus of persuasive authority"'"); cf. *Hope* v. *Pelzer*, 536 U. S. 730, 741 (2002) ("'[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though "the very action in question has not previously been held unlawful"'" (alteration omitted)).

From all this, the panel should have asked whether the existing precedent collectively established and put the officers on sufficient notice that their actions violated the Eighth Amendment.  Here, even without a case matching the exact conditions that Smith faced down to the exact degree and minute, the body of case law on needless deprivations of warmth in prisons made it abundantly clear, and beyond debate, that the officers' treatment of Smith violated the Eighth Amendment.

\* \* \*

Summary reversal is "'a rare disposition, usually reserved by this Court for situations in which the law is settled and stable, the facts are not in dispute, and the decision below is clearly in error.'" *Andrus* v. *Texas*, 596 U. S. ___, ___–___ (2022) (SOTOMAYOR, J., dissenting from denial of certiorari) (slip op., at 23–24). This Term, however, the Court has exercised its discretion to summarily reverse supposed errors that were far less clear than the one here. See, *e.g.*, *McCarthy* v. *Hernandez*, 607 U. S. ___ (2026) (*per curiam*); *Zorn* v. *Linton*, 607 U. S. ___ (2026) (*per curiam*); see also *Smith* v. *Scott*, 608 U. S. ___ (2026) (summarily vacating and remanding denial of qualified-immunity in light of *Zorn*). If those cases were clear enough for summary action, the Court here should have readily concluded, based on precedent and basic human decency, that it is beyond debate that it is cruel and unusual to lock someone intentionally in a freezing prison cell completely naked for 23 hours.

The Court's decision not to do so today exacerbates its asymmetrical trend of declining to intervene when courts wrongly afford officers the benefit of qualified immunity, but unflinchingly summarily reversing when it believes courts have wrongly denied officers the protection of qualified immunity. See, *e.g.*, *Zorn*, 607 U. S., at ___–___ (SOTOMAYOR, J., dissenting) (slip op., at 8–9); *Kisela* v. *Hughes*, 584 U. S. 100, 121 (2018) (SOTOMAYOR, J., dissenting). Reversing only denials of qualified immunity sends the regrettable message that, when choosing between shielding government officials from liability and vindicating individuals' constitutional rights, this Court will almost always choose the former. Because this decision emboldens government officials, like the correctional officers here, to act with impunity, I respectfully dissent from the Court's refusal to summarily reverse.